[No. G014759. Fourth Dist., Div. Three. Mar. 29, 1996.]

MARTHA SCOTT, Plaintiff and Appellant, v.
CONTINENTAL INSURANCE COMPANY, Defendant and Respondent.

COUNSEL

Rutan & Tucker, Garvin F. Shallenberger, Duke F. Wahlquist and Ina Raileanu for Plaintiff and Appellant.

Cummins & White, Larry M. Arnold, Robert W. Bollar and Annabelle M. Harris for Defendant and Respondent.

OPINION

SILLS, P. J.—

*Introduction and Facts*

In *Carty* v. *American States Ins. Co.* (1992) 7 Cal.App.4th 399, 402-403 [9 Cal.Rptr.2d 1], this court rejected the idea that the words "latent defect," as used in a homeowners insurance policy, only applied to some undetected defect in construction materials, and did not apply to faulty design or shoddy workmanship. In *Carty* we also held that because certain defects in the construction of the foundation of a home were "neither readily observable nor apparent on reasonable inspection," those defects were latent, and therefore the loss they caused was not covered under an insurance policy which specifically excluded loss due to latent defect. (*Id.* at p. 404.) In the process, we specifically declined to follow an Illinois appellate court opinion, *Mattis* v. *State Farm Fire & Cas. Co.* (1983) 118 Ill.App.3d 612 [73 Ill.Dec. 907, 454 N.E.2d 1156, 41 A.L.R.4th 1082], which involved the defective design or construction of a basement retaining wall. *Mattis* observed that "the great majority of the cases" limited the meaning of "latent defect" to inherent defects in *just* the construction materials, and only then when the defect "could not be discovered by any known or customary test." Latent defects would thus not include "defective construction" such as faulty design or shoddy workmanship. (*Id.* at p. 1162.)

The present case, like *Mattis*, also involves loss to a retaining wall. Here, the parking area retaining wall at an apartment complex in Monterey Park is leaning and cracking. Martha Scott, owner of the complex, requested her insurer to pay for repairs; the insurer, The Continental Insurance Company, has denied the claim because of the latent defect exclusion in the policy. Scott sued Continental, and Continental obtained a summary judgment based on stipulated facts.

The most significant facts are these. After Scott made her claim, the insurance company hired a geotechnical consulting firm to ascertain the cause of the distress to the wall. The consulting firm reviewed the permits, grading records and geotechnical documents, observed and mapped the distress to the wall, made borings in the parking area adjacent to the wall, hand-dug test pits along the toe of the retaining wall, prepared a geotechnical map, and tested soil and bedrock samples in the laboratory for moisture content. After all this work, plus more than 10 pages of abstruse mathematical calculations, the consulting firm (whose findings were accepted by the parties as true for purposes of a summary judgment motion) concluded that the wall was not designed for the actual pressures being exerted by the existing backfill. The wall was most likely designed to withstand 30 pounds per cubic foot equivalent fluid pressure; the actual pressure now being exerted is 44 pounds per square foot, and, with a lack of adequate drainage, can go as high as 62.4 pounds per square foot. The excessive pressure is enough to cause the wall to crack at its foundation and begin to lean downslope. Eventually, as the reinforcing steel in the wall rusts, the wall will fail.[1] Scott did not realize the cause of the cracking until the expert's report. Her insurance policy listed as an exclusion "Loss caused by . . . inherent or latent defect."

If we were only to look at *Carty*, we would affirm the judgment in an unpublished opinion. After all, if it took 10 pages of calculations made by an expert to figure out that the wall was defective, it would seem that the defect was most certainly "latent."

A year or so after *Carty*, however, *Chadwick* v. *Fire Ins. Exchange* (1993) 17 Cal.App.4th 1112 [21 Cal.Rptr.2d 871], rejected the idea that defects discoverable only by expert examination were per se latent. The *Chadwick* court noted that *Carty* (and two federal cases preceding it[2]) relied on a test—whether the defects were "readily observable" or "apparent on reasonable inspection"—derived from *Acme Galvanizing Co.* v. *Fireman's Fund Ins. Co.* (1990) 221 Cal.App.3d 170 [270 Cal.Rptr. 405]. *Acme* had derived

---

[1]Here is the summation of the consultants' findings in their own words: "Our findings indicate that the wall most probably was not designed for the actual loads that have developed from the existing backfill. This has probably caused the wall to crack at its stem and then lean downslope. The wall loads can be reduced or the wall can be replaced. The wall can be expected to continue to fail."

[2]*Tzung* v. *State Farm Fire and Cas. Co.* (9th Cir. 1989) 873 F.2d 1338 and *Winans* v. *State Farm Fire and Cas. Co.* (9th Cir. 1992) 968 F.2d 884.

the test from the statute of limitations dealing with construction defect suits against builders.[3]

According to *Chadwick*, the flaw in the *Acme Galvanizing* standard (and, by extension, its use in *Carty*) was that statutes of limitations are construed in exactly the opposite direction as insurance policy exclusions. To protect consumers, "latent" is given a broad definition in the statute of limitations context, while, as a term in an insurance policy exclusion, it must necessarily be given a narrow one. In the wake of *Chadwick*, Scott now challenges *Carty* as mistaken. In essence, she asks us to rethink the latent defect issue. We accept the invitation.

 In sum, we agree with *Chadwick* that the "neither readily observable nor apparent on reasonable inspection" standard articulated in *Acme Galvanizing* and later used by *Carty is* flawed. It does not comport with the ordinary sense of the word "latent."

We also agree with *Chadwick* that there can be no rule to the effect that a defect discoverable "only" by an expert is automatically latent. The ordinary sense of the word latent contemplates a hypothetical inspection of "searching" intensity, and not every expert inspection necessarily rises to that level.

We disagree, however, with the line of out-of-state cases discussed in *Chadwick* which holds that latent defects can never be construction or design defects. Such a conclusion is both contrary to the ordinary sense of the word "defect" and contrary to well-established California law.

And in the process, we also disagree with the suggestion in those cases that a "latent" defect can only be one which is not discoverable by *any* test. Again, such a rule does not comport with the ordinary sense of the word "defect."

Putting our conclusions together, the bottom line is that the summary judgment must be reversed. The papers did not establish the necessity for an inspection of "searching" intensity.

*A Latent Defect Is One Which Is Both Not Readily Observable and Not Discoverable to Any but the Most Searching Inspection*

 Words in an insurance policy, unless given special meanings by the policy itself, must be understood in their ordinary sense. (E.g., *Waller* v.

---

[3]Code of Civil Procedure section 337.15.

*Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) In seeking to ascertain the ordinary sense of words, courts in insurance cases regularly turn to general dictionaries. (*A.B.S. Clothing Collection, Inc.* v. *Home Ins. Co.* (1995) 34 Cal.App.4th 1470, 1480 [41 Cal.Rptr.2d 166] [using dictionary to determine ordinary meaning of "cumulate"]; *Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 745 [15 Cal.Rptr.2d 815] [using dictionary as source for ordinary meaning of "intend"]; *St. Paul Fire & Marine Ins. Co.* v. *Superior Court* (1984) 161 Cal.App.3d 1199, 1202 [208 Cal.Rptr. 5] [using dictionary to determine meaning of "accidental" in its "plain and ordinary" sense].)

Likewise, courts in noninsurance contexts turn to general dictionaries when they seek to ascertain the "ordinary" meaning of words used in a statute. (E.g., *River Lines, Inc.* v. *Public Util. Com.* (1965) 62 Cal.2d 244, 247 [42 Cal.Rptr. 104, 398 P.2d 144] [using dictionary, among other sources, to show "ordinary concept of a carrier" under public utilities statute]; *Brown* v. *Municipal Court* (1978) 86 Cal.App.3d 357, 364-365 [150 Cal.Rptr. 216] [using dictionary to ascertain "failure" and "inability" as used in drunk driving statute]; *Standard Oil Co.* v. *State Bd. of Equalization* (1974) 39 Cal.App.3d 765, 768 [114 Cal.Rptr. 571] [using dictionary to ascertain ordinary meaning of "mains," "lines," and "pipes" under tax statute]; see also *E.W. Bliss Co.* v. *Superior Court* (1989) 210 Cal.App.3d 1254, 1258, fn. 2 [258 Cal.Rptr. 783] ["A dictionary is a proper source to determine the usual and ordinary meaning of a word or phrase in a statute"]; but compare *People* v. *Buese* (1963) 220 Cal.App.2d 802, 806 [34 Cal.Rptr. 102] [asserting that dictionary definition of "drug" marked "the outer limits of reasonability" for purposes of a penal statute] with *People* v. *Garcia* (1934) 1 Cal.App.2d Supp. 761, 765 [32 P.2d 445] [using dictionary definition of "drug" to find its "usual, natural and ordinary sense"].)

Indeed, courts in both insurance and noninsurance contexts regularly use the phrase "ordinary dictionary definition [or meaning]" as if "ordinary" were synonymous with "dictionary." (E.g., *People* v. *Anderson* (1968) 70 Cal.2d 15, 26 [73 Cal.Rptr. 550, 447 P.2d 942] ["we find no indication that the Legislature intended to give the words 'deliberate' and 'premeditated' other than their ordinary dictionary meanings"]; *Ponder* v. *Blue Cross of Southern California* (1983) 145 Cal.App.3d 709, 722 [193 Cal.Rptr. 632] [". . . the rest of that definition is consistent with the ordinary dictionary definition of the term 'dental' "]; *People* v. *Orabuena* (1976) 56 Cal.App.3d 540, 545 [128 Cal.Rptr. 474] ["The words 'deliberate' and 'premeditated' are not words of art, but are to be construed in their ordinary dictionary

meaning"].) It is thus safe to say that the "ordinary" sense of a word is to be found in its dictionary definition.[4]

Sometimes the "ordinary dictionary" meaning of a word coincides with its statutory definition. (E.g., *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 828 [274 Cal.Rptr. 820, 799 P.2d 1253] [". . . we take the statutory and dictionary definitions described above to be the 'ordinary and popular' definition of 'damages' for interpretation purposes"].)

Then again, sometimes it does not. The statutory definition of "latent deficiency" found in section 337.15 of the Code of Civil Procedure, for example, ("a deficiency which is not apparent by reasonable inspection") begins with the introductory clause, "[a]s used in this section," indicating that its authors were articulating a specialized definition for specific purposes. Yet the court in *Acme Galvanizing* plucked the definition of latent deficiency from the statute merely because the definition "provid[ed] a useful standard." (*Acme Galvanizing Co.* v. *Fireman's Fund Ins. Co., supra,* 221 Cal.App.3d at p. 178.) The court did not say why it was "useful."

"Reasonable inspection" is a fairly easy definition for courts to apply, and if we were drafting an insurance contract on behalf of an insurer, we would see the merit of specially defining latent defect the way the Code of Civil Procedure does. But we cannot escape the rule that words in an insurance policy are to be construed in their ordinary sense, even if that sense provides a definition a little less tidy than some litigants, and perhaps the courts, might desire.[5] When ordinary people do not understand the meaning of a word, they do not turn to the Code of Civil Procedure. They turn to a dictionary. We thus agree with *Chadwick*'s criticism of *Acme Galvanizing*'s "reasonable inspection" formula as rooted in the wrong source. (See *Chadwick* v. *Fire Ins. Exchange, supra,* 17 Cal.App.4th at pp. 1123-1124.)

---

[4]Of course, the use of a mere dictionary to solve a legal problem can be the subject of easy ridicule. (See *Unzueta* v. *Ocean View School Dist.* (1992) 6 Cal.App.4th 1689, 1705 [8 Cal.Rptr.2d 614] (dis. opn. of Gilbert J.) [chiding majority for adhering to "dictionary school of jurisprudence"].) The truth behind this potential for ridicule is that dictionary definitions cannot be applied simplistically. For example, the multiple meanings of a word as found in a dictionary cannot be inserted into the text of an insurance policy without regard to the document construed as a whole, the exact context of the language, other basic rules of contract interpretation, and the reasonable expectations of the insured. (See *ACL Technologies, Inc.* v. *Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1785-1789 [22 Cal.Rptr.2d 206].)

[5]"Reasonable inspection" has a wonderfully seductive appeal for judges, who generally have no problem figuring out what is "reasonable." "Most searching," on the other hand, is a harder standard to apply, requiring more attention to the fiddling details of each individual case.

Still, as happened in *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807, a statutory meaning and a dictionary meaning may be coterminous. Just because *Acme Galvanizing* looked to the wrong source for the meaning of latent defect does not mean it still might not have come up with the right answer, if only by coincidence. So we now examine the dictionary definition of the critical words.

The word "latent" derives from the Latin word which means "to lie hidden," and is akin to an ancient German word for den or lair, an ancient Norse word for deceit, a Greek word for escaping notice, and an old Slavic word for lying in wait. While Webster's Third New International Dictionary gives a myriad of usage examples, it provides but two basic definitions, with several variations of the first basic definition. The first definition is "existing in hidden, dormant, or repressed form," as, for example, in the phrase that someone's "sinister qualities, formerly latent, quickened into life." A variation on that is "present or capable of living or developing in a host without producing visible symptoms of disease," as in "a latent virus." A final variation pertains simply to fingerprints: *"of a fingerprint*: obtained at the scene of a crime and usu[ally] scarcely visible but capable of being developed for study," as in the "search for latent prints."

The second basic definition is merely, "concealed, disguised." But then the dictionary elaborates. "LATENT applies to that which is submerged and not clearly apparent or certainly present *to any but a most searching examination* but may emerge and develop with effect and significance." (Webster's Third New Internat. Dict. (1979) p. 1275, italics added.) An example is Dickens's line about " 'the *latent* uneasiness in Darnay's mind [being] roused to vigorous life by this letter.' " (*Ibid.*)

Two central ideas emerge from the definitions. First, if something is latent one cannot see it. One might be able to discover it, but it is not—to use a phrase that fairly leaps from the dictionary definition—"readily observable."

Second, the difficulty of discovering whether a defect is "latent" must be substantial. A latent quality cannot be detected with merely a cursory inspection. Something which is latent is not apparent "to any but a most searching examination." It takes hard work to develop fingerprints or detect a hidden virus.

■ We may now draw our first conclusion. The sense of "latent" as discoverable if sufficient efforts are exerted compels us to reject *Mattis* and

other cases to the degree they restrict the latent defect exclusion to defects that "could not be discovered by any known or customary test." (*Mattis v. State Farm Fire & Cas. Co., supra,* 454 N.E.2d at p. 1162, citing *Plaza Equities Corp. v. Aetna Casualty. & Surety Co.* (S.D.N.Y. 1974) 372 F.Supp. 1325; *Essex House v. St. Paul Fire & Marine Insurance Co.* (S.D. Ohio 1975) 404 F.Supp. 978; *General American Transp. Corp. v. Sun Insurance Office, Ltd.* (E.D.Tenn. 1965) 239 F.Supp. 844.) Not discoverable by *any* test simply does not comport with the idea that a "most searching examination" *can* reveal it (as, e.g., with fingerprints).

A tougher question, however, is whether this sense of something that is apparent only by the "most searching" efforts corresponds with the "reasonable inspection" formula enunciated in *Acme Galvanizing* and followed in *Carty*. Do "most searching" efforts extend beyond "reasonable" efforts? Instinctually, there is at least something to be said for the idea that "most searching" efforts and "reasonable efforts" are, as the British say, pretty much of a muchness. After all, practically nothing in Anglo-American law countenances unreasonable anything, much less *requires* it as part of a definition. In rethinking the issue of latent defect, can it not be said that the test used in *Acme Galvanizing* and *Carty* is the substantial equivalent of the dictionary's standard?

No. That would be a little like a nation which wages a foreign war, and, after having lost every battle, decides to declare victory and go home. The action does not meet the substance of the problem. Reasonable is *not* a synonym for "most searching." "A most searching examination" conveys a special sense of intensity not always inherent in the word "reasonable." Simply put, "reasonable inspections" may not *always* be "intense" or "most searching."

The *Acme Galvanizing* test is thus incomplete, because it lacks the sense of intensity an ordinary person would expect. We therefore agree with *Chadwick* in its rejection of the test to the extent it would make "latent" a defect which is not apparent on merely a "reasonable" inspection. To put the matter in terms of, say, a jury instruction: A latent defect is one which is both *not readily observable* and *not discoverable to any but the most searching examination.*

### Defects Discoverable Only by Expert Examination Are Not Automatically "Latent"

Intuitively, it would seem that if a construction defect is only discoverable by an "expert" examination it is most certainly "latent." Surely, one might

ask, if it takes some geotechnician or soils expert (the sort of person who understands the difference, for example, between sandy clay and clayey sand) to figure out that a contractor goofed, the defect is "latent" as an ordinary person would understand the term.

The problem with this intuitive line of reasoning is that the ordinary dictionary definition of the word focuses on the intensity of the hypothetical inspection, not who conducts it. In the light of that definition, the expert versus nonexpert distinction is what the logicians call a false dichotomy. Perhaps it is true that *most* inspections conducted by experts will be sufficiently "searching" to be reasonably described as "most searching." In the case before us, for example, there can be absolutely no doubt that the defect in the retaining wall did indeed become apparent after a "most searching examination." Reviewing permits, grading records and geotechnical documents, mapping out wall distress, boring through parking areas, digging test pits, testing dirt and working out 10 pages of mathematical equations represents a great deal of effort indeed to unearth the cause of a loss.

But it is a logical flaw to assume that just because experts *conducted* a most searching inspection for defects that the defects were *only* discoverable by a most searching inspection. We cannot say, as a matter of law, that every expert inspection automatically is "a most searching one" nor that, even if a "most searching" inspection was employed, an inspection of such scope was necessarily required to discover the defect. It is possible to imagine instances where a defect is not readily observable, but is still apparent to an expert's *cursory* examination and therefore not latent.[6] Accordingly, we agree with *Chadwick* that "defects discoverable only by expert examination" are not

---

[6]In *Essex House* v. *St. Paul Fire & Marine Insurance. Co., supra,* 404 F.Supp. at page 992, the court observed that "[n]othing more than a simple visual inspection of the Essex House and the construction plans would have been sufficient to detect the shoddy building techniques employed therein." We may leave for another day the question of whether the effort required to obtain building plans, and the expertise required to decipher them, would amount to a sufficiently "searching" examination under California law. However, there is a fictional example which is on "all fours" as to whether a defect may be discovered by a mere cursory examination by an expert. It is from a humorous story entitled *The Builders* by John Cleese and Connie Booth:

The owners of a hotel, a married couple, desire to renovate the lobby by putting a new door through to their kitchen and block off an existing door to a drawing room. To save money, the husband hires a contractor named O'Reilly, who is totally incompetent. After an initial misunderstanding about the nature of the job (O'Reilly manages to block off all access to the kitchen), he hurries to put things to right before the wife arrives back from a golf excursion. Miraculously he completes the job. It looks fine.

An *expert* building contractor named Stubbs arrives. The wife, apropos her low opinion of O'Reilly, comments that the work will probably "all fall down by lunch time," and the husband, rather too smug that the bargain-basement contractor O'Reilly has performed so

"per se latent." (See *Chadwick* v. *Fire Ins. Exchange, supra,* 17 Cal.App.4th at pp. 1122-1125 and particularly p. 1125.)

### Latent Defects Include Defects in Design and Construction

After canvassing a series of out-of-state cases predating *Acme Galvaniz-ing*[7] the *Chadwick* court observed that those cases restricted the scope of latent defect and inherent vice exclusions to flaws or deficiencies in the materials used, such that "faulty design or construction is deemed not to come within the exclusions." (*Chadwick* v. *Fire Ins. Exchange, supra,* 17 Cal.App.4th at p. 1121.) There is, however, a question as to whether the *Chadwick* court really endorsed the idea. In specific terms the case *held* that cracks in the interior sheetrock of a home largely due to the substitution of floor trusses for joists, together with "numerous deficiencies in the design and construction of the house's floor plan and frame" created a triable issue of fact as to whether "a reasonable expert inspection" at the time the insurance policy was issued "would have revealed the defects causing [the] homeowners' loss and, hence, as to whether the defects came within the exclusion for latent defect or inherent vice." (*Id.* at pp. 1115 & 1126.) Thus even though the record before the court precluded summary judgment in favor of the insurer, the court seemed to leave open the possibility that "deficiencies in design and construction" *might* yet come within the exclusion if they fell outside the purview of a "reasonable expert inspection."[8]

---

well, retorts (with a pride-goes-before-the-fall confidence), "Well, let's ask a real *expert*! Do *you* think it'll all fall down by lunch, Mr Stubbs?"

Initially judging by just what was readily observable, the expert Stubbs declares "It's a very good job."

The husband then shows Stubbs where the new door was knocked through and the old one was blocked off. Stubbs casually asks what was used for the lintel (the horizontal beam which usually carries the load of everything above a door)—an iron girder or something made of concrete? The husband is forced to answer that a wooden one was used.

The jig is up. The expert realizes the implications of the defect. "But that's a supporting wall! . . . . It could give way any moment."

The husband is last seen striding out of the hotel, carrying a garden gnome, cap pointing outward, looking for O'Reilly. (Cleese & Booth, *The Builders,* in The Complete Fawlty Towers (1988) at pp. 27-48, and particularly pp. 45 & 47, original italics.)

In *The Builders,* the expert's "examination" is cursory indeed. One look at the wall and one casual question by an expert and the defect is revealed.

[7]In addition to *Plaza Equities, Essex House,* and *General American Transp.* already mentioned, the *Chadwick* court discussed *Mellon* v. *Federal Ins. Co.* (S.D.N.Y. 1926) 14 F.2d 997 and *Employer's Casualty Company* v. *Holm* (Tex.Civ.App. 1965) 393 S.W.2d 363.

[8]See *Chadwick* v. *Fire Ins. Exchange, supra,* 17 Cal.App.4th at page 1126. By framing the question in terms of "reasonable expert examination," the *Chadwick* court appears to have itself fallen into the "reasonableness" trap. (See fn. 5, *ante,* p. 30.) Perhaps most examinations which are conducted by experts are indeed of the "most searching" variety. Even so, as

In any event, the materials-versus-design-and-construction dichotomy discussed in *Chadwick* is just as false as the layperson-expert dichotomy we have discussed above. There is nothing in the word "defect" (as in "latent defect") to restrict it to just structural deficiencies in materials.

"Defect," when used as a noun, is a general term. It is "an *irregularity* in a surface or a structure that spoils the appearance or causes weakness or failure: fault, flaw . . . want or absence of *something* necessary for completeness, perfection, or adequacy in form or function: deficiency, weakness —as opposed to excess." (Webster's Third New Internat. Dict., *supra*, at p. 590, italics added.) Examples of usage given by the dictionary are phrases like "a moral defect in his nature," "several defects can be found in this argument," and "a defect in his hearing." (*Ibid.*) Nothing suggests a limitation to just materials or structure. Faults, flaws and irregularities can be the result of design or faulty construction just as much as mere weakness of material.

Moreover, to restrict the word to just materials not only unnaturally constricts its meaning to something less than its ordinary sense,[9] but runs contrary to the well-established view that contractor negligence can, indeed, be a *cause* of first party loss. (See *Garvey* v. *State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 408 [257 Cal.Rptr. 292, 770 P.2d 704] [rejecting contention that third party negligence of a contractor is not a covered peril].) Contractor negligence often extends to poor workmanship or design, as distinct from the selection of poor quality materials in which there is some inherent propensity for structural failure.

Finally, from the viewpoint of reasonable expectations the distinction makes no sense. A retaining wall might buckle because it was made of low-quality materials, or it might buckle because someone forgot reinforcing steel, or did not design it to withstand the backfill. An insured looking at the ordinary meaning of "defect" would have no reason to distinguish among the possible causes. Thus to the degree that *Chadwick* may (arguably) stand for a per se rule that design and construction flaws cannot fall into the latent defect exclusion, we must respectfully part company.

related above, the idea of a most searching inspection does not automatically entail an "expert" examination at all. It is the nature of construction defects that each case must be judged by careful attention to its own peculiar facts.

[9]While ambiguities are classically construed against insurers, courts must not strain to create ambiguity by artificially reducing the ordinary scope of words. To use "defect" to mean *only* weakness of physical materials is to use the word more as a term of art rather than in its ordinary sense.

*Summary Judgment Was Not Appropriate on This Record Because There Was Insufficient Evidence as to the Intensity of Inspection Necessary to Determine the Cause of the Loss*

As mentioned above, we have no doubt that the examination which was actually performed by the geotechnical consultants was of the "most searching" variety. There are, however, some missing gaps in the evidence which preclude affirmance.

In a word, while we know what *was* done to thoroughly study the defects after their discovery here, we do not know what was *needed* to be done to merely detect them. The record does not reveal the intensity of inspection (expert or no expert) that was necessary at the time the policy was issued to reveal the cause of any loss to the retaining wall.[10] All the record reveals is that Scott *herself* was not aware of the cause of her loss until the geotechnical consultants' report, and the consultants went to considerable efforts to identify the defect. We do not know whether a more cursory examination at the time the policy was issued might have revealed the cause, *either* by Scott or an expert.

We decline to draw the inference that because Scott did not actually discover the cause until the expert's report that she could not have discovered it earlier, or that the cause of her loss might not have been ascertainable upon a less-than-searching examination. There are other explanations not precluded by the record. Perhaps she is an absentee landlord who never inspects her own property. Perhaps she never actually looked at the wall.

At the most, the summary judgment motion here was premature; at the least, additional evidence might show that the defect was obvious upon a less than "searching" inspection, and therefore not latent at all. Either way, we cannot affirm.[11]

---

[10]*Chadwick* never discussed in detail the question of when a defect is "latent" for purposes of the exclusion, but a moment's reflection demonstrates that the time of the hypothetical inspection must be, as the *Chadwick* court stated, when the policy was issued. (See *Chadwick* v. *Ins. Exchange, supra*, at p. 1126.) After all, that is when the insurer assumed the risk of loss to the property.

[11]The *Chadwick* court noted there is a direct relationship between the general doctrine in insurance law that a loss must be fortuitous to be insurable (see Ins. Code, § 22) and the latent defect exclusion. (See *Chadwick* v. *Fire Ins. Exchange, supra*, 17 Cal.App.4th at p. 1119, citing Hecker & Goode, *Wear and Tear, Inherent Vice, Deterioration, etc.: the Multi-Faceted All-Risk Exclusions* (1986) 21 Tort & Ins. L. J. 634, 634-635, 638-640.) It appears that the latent defect and inherent vice exclusions are attempts to embody, in the text of the policy, the

*Conclusion*

The trial court determined that on the record before it the latent defect exclusion applied to Scott's loss as a matter of law. The judgment to that effect is reversed. Scott is to recover her costs.

Wallin, J., and Rylaarsdam, J., concurred.

---

need for fortuity. (See *Compagnie Des Bauxites* v. *Ins. Co. of No. America* (W.D.Pa. 1983) 554 F.Supp. 1080, 1084 ["The law is quite clear that an insurer is not liable for losses resulting from inherent vice, defect or infirmity in the subject matter insured, for this type of loss is not caused by chance or an extraneous event."].) The idea is that damage from an "inherent cause" is, like wear and tear, a "certainty," and therefore "uninsurable." (See *Chadwick* v. *Fire Ins. Exchange, supra,* 17 Cal.App.4th at p. 1119.) However, because the parties have not briefed the effect of the fortuity doctrine on this loss, we express no opinion on the question of whether the fortuity doctrine, to the degree that it may be separable from its embodiment in the latent defect exclusion, precludes coverage in this case.