[No. A089933. First Dist., Div. Three. Oct. 31, 2001.]

STAMM THEATRES, INC., et al. Plaintiffs and Appellants, v. HARTFORD CASUALTY INSURANCE COMPANY, Defendant and Respondent.

[No. A090372. First Dist., Div. Three. Oct. 31, 2001.]

STAMM THEATRES, INC., et al. Plaintiffs and Respondents, v. HARTFORD CASUALTY INSURANCE COMPANY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 2 of the Discussion.

**COUNSEL**

Miles, Brummitt & Passalacqua, Chipman Miles and William C. Reeves for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Rudloff Wood & Barrows, G. Edward Rudloff, Jr., Marjie D. Barrows and Susan A. Byron for Defendant and Respondent and for Defendant and Appellant.

## OPINION

**PARRILLI, J.**—The dictionary definitions of "decay" include a general sense of gradual deterioration in strength or soundness, and a more specific sense of rot or organic decomposition. This case presents the question whether a property insurance policy covering collapse of a building due to "hidden decay" applies to the unexpected failure of wooden roof trusses, with no evidence of rot. We conclude that coverage cannot be ruled out merely because the trusses were not rotten. An insurer promising coverage for collapse due to "hidden decay," without limiting the scope of the term to organic decay, is liable on claims for any collapse caused by a concealed process of gradual loss in the strength of building materials, unless other policy terms limit coverage. Under this policy and the circumstances of this case, the insured could reasonably expect coverage for an imminent collapse caused by the weakening roof trusses, unless the failure was caused by defective materials or construction methods.

Stamm Theatres, Inc., and its co-owners George F. Stamm and Mary Ann Bolacco (collectively, Stamm) sued Hartford Casualty Insurance Company (Hartford), among other defendants. Hartford had sold Stamm a commercial property insurance policy for a movie theater in Antioch, California. Stamm alleged that cracks in the theater's roof trusses were covered by a policy provision promising to pay for damage "involving collapse of a building" caused by "[h]idden decay."

Hartford successfully moved for summary adjudication based on a ruling by the trial court that "decay" is synonymous with rot or decomposition of organic material. The only issue remaining for trial was whether Hartford had wrongfully refused to pay for temporarily shoring up the building while Hartford was investigating the claim. A jury awarded Stamm $114,700 for the costs of shoring, finding in a special verdict that Hartford had promised to pay for the shoring.

Stamm appeals, contending the trial court imposed an unduly restrictive interpretation on the policy term "decay." Hartford also appeals. It claims the evidence was insufficient to support the verdict, and the trial court committed prejudicial error in formulating the special verdict form and in

responding to a query from the jury. We agree with Stamm that the court's definition of "decay" was too narrow, and summary adjudication was erroneously granted. In the unpublished portion of our opinion, we reject Hartford's claims of error.

## BACKGROUND

Stamm's theater was built around 1948. The policy at issue covered the period from July 1, 1996, to July 1, 1997. The relevant provisions are in a section entitled "ADDITIONAL COVERAGE — COLLAPSE." They state:

"We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one of the following:

"1. The 'specified causes of loss' or breakage of building glass, all only as insured against in this Coverage Part;

"2. Hidden decay;

"3. Hidden insect or vermin damage;

"4. Weight of people or personal property;

"5. Weight of rain that collects on a roof;

"6. Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of this construction, remodeling or renovation. [¶] . . . [¶]

"Collapse does not included [sic] settling, cracking, shrinkage, bulging or expansion."

The "specified causes of loss" are "[f]ire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage."

On June 9, 1997, Stamm notified Hartford that ceiling plaster in the theater was falling and cracking. On June 17, an engineer retained by Hartford inspected the building and found it was in a state of "imminent collapse." The theater's roof was supported by wooden "bowstring" trusses, with curved top chords, straight horizontal bottom chords, and diagonal

members running between the top and bottom chords. Several of the bottom chords had cracked completely through where they joined diagonal web members.

A claims adjuster hired by Hartford, Douglas Bailey, accompanied the engineer on the June 17 inspection. Bailey, the engineer, and George Stamm discussed the need for shoring up the ceiling. George Stamm testified that Bailey made a telephone call to Hartford, then told him Hartford had "authorized" the erection of shoring. Shoring was installed on June 19 and 20, 1997. Hartford's regional claims adjustor for large first party property damage claims, Allen Holland, visited the theater on June 19. Holland testified that he orally advised George Stamm that the shoring might or might not be covered. On June 19, Holland took over the claim and left a message for Bailey to close his file. Bailey did not get the message until the next day. Earlier on the 20th, before he learned he had been relieved, Bailey placed a phone call to the contractor in charge of the shoring. Bailey's notes of the call stated, "temporary towers begun at authorization of Al Holland."

George Stamm signed a work authorization form on which the contractor had written, "there may not be insurance coverage. If no coverage owner agrees to pay." George Stamm testified that since Hartford had already authorized the shoring, he understood he would not have to pay for that, although coverage for the damage to the roof was still in question.

On August 4, 1998, Hartford denied coverage for the failure of the roof trusses. The shoring was still in place, at a monthly cost of $4,800.

The parties asked the trial court for a pretrial ruling on the meaning of the term "hidden decay." The court decided that "decay" is "synonymous with the words rot and decomposition. Rot or decomposition is the destruction of organic matter as a result of bacteria, fungus, insects, vermin or like action." The court also noted that decay is often the result of water damage. Hartford's motion for summary adjudication was premised on this definition. For purposes of the motion, Hartford conceded that the roof of the theater had collapsed. (See *Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co.* (1997) 60 Cal.App.4th 400, 406 [70 Cal.Rptr.2d 260] [collapse coverage applies to both actual and imminent collapse].)

Hartford noted that both of Stamm's experts said they saw no evidence of decay in the roof trusses. Joshua Kardon, Stamm's structural engineer, attributed the failure of the trusses to the increased load created by a partial reroofing, to repeated cycles of elevated temperatures over the years which degraded the strength of the truss members, and to the presence of knots in

the bottom chords. Kardon identified the degradation due to temperature differences as the primary factor. He had inspected the theater and saw no evidence of decay, which to him meant rot caused by some microscopic agent.

Hartford also relied on the conclusions of Stephen Quarles, a wood scientist retained as an expert witness by Stamm. Quarles had not inspected the theater himself, but he reviewed Kardon's work and the reports of Hartford's engineers. Quarles did not believe that temperature fluctuations alone were a factor, but placed primary responsibility for the collapse on cycles of high and low humidity which, over time, eroded the ability of the wooden trusses to withstand their load. Quarles placed secondary importance on the presence of knots, and acknowledged a nominal amount of overloading. He stated that "as a wood person" he defined "wood decay" differently than the dictionary. To him, it meant "fungal degradation of the wood."

Hartford's structural engineers, Patrick Buscovich and Kenneth Smetts, jointly produced a report concluding the collapse was caused by "overstress in the bottom chord members in comparison to their axial load capacity." Hartford characterized this finding as one of "design defect" (though it did not rely on the policy provision covering collapse due to "defective material or methods in construction . . . if the collapse occurs during the course of this construction"). These engineers had inspected the trusses and found them clean and dry but cracked, with no apparent fungal growth, mold, insect damage, or wet or dry rot.

In its opposition to the summary adjudication motion, Stamm noted that Buscovich and Smetts conceded the trusses complied with all building regulations in effect when the theater was built. In view of that fact, and the fact that the trusses had borne the load placed on them for 49 years, Stamm argued the collapse could not be attributed to a design defect. Stamm pointed out that the trial court's ruling on the meaning of "hidden decay" included invasion by water as a factor that may cause decay. Stamm contended this element of the court's definition was satisfied by Quarles's conclusion that cycles of moisture and dryness in the wood had caused it to lose strength.

In its ruling granting summary adjudication, the trial court rejected Stamm's arguments, stating "moisture in the air is not a foreign agent as humidity is a natural condition." The court noted "the policy excluded shrinkage or expansion which ostensibly results from moisture in the air." The court reiterated that decay means the destruction of organic matter by rot or decomposition, and concluded "the reaction of the wooden roof trusses

at the theatre to heat and moisture in the air that existed from the time of construction onward is a wear and tear factor and not a catastrophe of the type that the policy is intended to cover."

## DISCUSSION

### 1. *Summary Adjudication Was Improper*

We review the trial court's grant of summary adjudication de novo, to determine whether the moving and opposing papers show a triable issue of material fact. (*Maxconn Inc. v. Truck Ins. Exchange* (1999) 74 Cal.App.4th 1267, 1272 [88 Cal.Rptr.2d 750].)

■ The principles guiding our interpretation of policy terms are well settled. " '[I]nterpretation of an insurance policy is a question of law.' [Citation.] 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citation.] Thus, 'the mutual intention of the parties at the time the contract is formed governs interpretation.' [Citation.] If possible, we infer this intent solely from the written provisions of the insurance policy. [Citation.] If the policy language 'is clear and explicit, it governs.' [Citation.]

"When interpreting a policy provision, we must give its terms their ' "ordinary and popular sense," ' unless "used by the parties in a technical sense or a special meaning is given to them by usage." ' [Citation.] We must also interpret these terms 'in context' [citation], and give effect 'to every part' of the policy with 'each clause helping to interpret the other.' [Citations.]

"A policy provision is ambiguous only if it is susceptible to two or more reasonable constructions despite the plain meaning of its terms within the context of the policy as a whole. [Citation.] The court may then 'invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' [Citation.]" (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115, italics omitted [90 Cal.Rptr.2d 647, 988 P.2d 568].)

■ " '[I]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.] This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable

expectations of the insured.' [Citation.] Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. [Citation.]

■ "In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' [Citations.]" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264-1265 [10 Cal.Rptr.2d 538, 833 P.2d 545], italics in original; see also *Mez Industries, Inc. v. Pacific Nat. Ins. Co.* (1999) 76 Cal.App.4th 856, 869 [90 Cal.Rptr.2d 721] ["An insured will not be able successfully to claim coverage where a reasonable person would not expect it."].)

■ Stamm contends the policy term "decay" is broadly synonymous with deterioration, connoting a decline in strength or soundness. If ambiguity arises from the narrower connotation of "decay" as rot or decomposition, Stamm claims the ambiguity must be resolved against Hartford, under the settled principles stated above. This argument is well taken.

■ "In seeking to ascertain the ordinary sense of words, courts in insurance cases regularly turn to general dictionaries. [Citations.] [¶] Likewise, courts in noninsurance contexts turn to general dictionaries when they seek to ascertain the 'ordinary' meaning of words used in a statute. [Citations.] [¶] Indeed, courts in both insurance and noninsurance contexts regularly use the phrase 'ordinary dictionary definition [or meaning]' as if 'ordinary' were synonymous with 'dictionary.' [Citations.] . . . It is thus safe to say that the 'ordinary' sense of a word is to be found in its dictionary definition.[1]" (*Scott v. Continental Ins. Co.* (1996) 44 Cal.App.4th 24, 29-30 [51 Cal.Rptr.2d 566].)

■ Stamm correctly points out that dictionaries define "decay" broadly as gradual deterioration, and also more narrowly as decomposition of

---

[1]"Of course, the use of a mere dictionary to solve a legal problem can be the subject of easy ridicule. [Citation.] The truth behind this potential for ridicule is that dictionary definitions cannot be applied simplistically. For example, the multiple meanings of a word as found in a dictionary cannot be inserted into the text of an insurance policy without regard to the document construed as a whole, the exact context of the language, other basic rules of contract interpretation, and the reasonable expectations of the insured. [Citation.]"

organic matter. Most dictionaries give the more general definition first.[2] In the context of this property insurance policy, we note at the outset that the "rot" definition adopted by the trial court excludes the deterioration of such common inorganic building materials as cement, brick, stone, and steel. This immediately suggests an unduly narrow limitation; a reasonable insured could surely expect coverage if an imminent collapse was brought on by hidden decay in such materials, which cannot "rot." While "decay" as applied to wooden components may first bring to mind the notion of "rot," the broader connotation of gradual loss of strength is also an ordinary meaning of the term, and is fully consistent with the intended function of the policy term "hidden decay."

Hartford argues that the broader definition of "decay" "is circular as virtually all structures that collapse do so because of a decline in structural strength or soundness." However, not all collapses are due to a *gradual* process of deterioration. The "specified causes of loss" in Hartford's collapse coverage include numerous potential causes that clearly do not amount

---

[2]For instance, Merriam-Webster's Collegiate Dictionary defines the noun "decay" as: "1 : gradual decline in strength, soundness, or prosperity or in degree of excellence or perfection [¶] 2 : a wasting or wearing away : RUIN [¶] 3 *obsolete*: DESTRUCTION, DEATH [¶] 4 a : ROT; *specifically*: aerobic decomposition of proteins chiefly by bacteria b : the product of decay [¶] 5 : a decline in health or vigor [¶] 6 : decrease in quantity, activity, or force: as a : spontaneous decrease in the number of radioactive atoms in radioactive material b : spontaneous disintegration (as of an atom or a particle)." (<http://www.merriam webster.com> (as of Oct. 30, 2001); see also Webster's 7th New Collegiate Dict. (1972) p. 213; Webster's 3d New Internat. Dict. (1970) p. 584.)

The Oxford English Dictionary (2d ed. CD-ROM 1994) defines "decay" as: "1.a. The process of falling off from a prosperous or thriving condition; progressive decline; the condition of one who has thus fallen off or declined. . . . b. Formerly sometimes = Downfall, destruction, ruin; *poet.* fall, death. *Obs.* . . . 2.a. Falling off (in quantity, volume, intensity, etc.); dwindling, decrease. *Obs.* . . . b. *Physics.* The gradual decrease in the radioactivity of a substance; hence, the spontaneous transformation of a single atomic nucleus or elementary particle into one or more different nuclei or particles. . . . c. A progressive diminution in the amplitude of an oscillation or vibration. . . . 3.a. Of material things: Wasting or wearing away, disintegration; dilapidation, ruinous condition. . . . b. *pl.* Dilapidations; *concr.* ruined remains, ruins, debris, detritus. (Rarely in *sing.*) *Obs.* . . . c. *fig.* The gradual 'wearing down' of words or phonetic elements in language. . . . 4.a. Decline of the vital energy or faculties (through disease or old age); breaking up of the health and constitution; formerly also (with *pl.*), effect, mark, or sign of physical decay. . . . b. *spec.* Consumption, phthisis; 'a decline'. . . . 5. The destructive decomposition or wasting of organic tissue; rotting. . . . 6. A cause of decay; the 'destruction' or 'ruin *of*' anything. *Obs.* . . . 7. Failure of payment or rent; arrears. *Obs.*"

The American Heritage Dictionary gives the "rot" definition first: "1.a. The destruction or decomposition of organic matter as a result of bacterial or fungal action; rot. b. Rotted matter. 2. *Physics* Radioactive decay. 3. *Aerospace* The decrease in orbital altitude of an artificial satellite as a result of conditions such as atmospheric drag. 4. A gradual deterioration to an inferior state: tooth decay; urban decay. 5. A falling into ruin." (<http://www.bartleby.com/61/92/D0069200.html> [as of Oct. 30, 2001].)

to "decay" in the broader sense: "Fire; lightning; explosion; windstorm . . . aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet . . . ." Furthermore, many signs of decay are obvious and thus would never fall within the policy's coverage for "hidden decay."

Hartford also insists that a broad definition of "decay" would transform the policy into a maintenance agreement. We disagree. The coverage provisions at issue come into play only when a building is in a state of collapse, well beyond the point at which ordinary maintenance would be called for. Moreover, maintenance is typically performed on detectable forms of deterioration, not on "hidden decay."

In its pretrial ruling defining "hidden decay" as rot or organic decomposition, the trial court reasoned that other parts of the policy suggest no coverage was intended for "natural decline." The court noted the policy exclusion for damage caused by "wear and tear," and the specification that collapse does not include settling, cracking, shrinkage, bulging or expansion. The court decided that a broad reading of "decay" would render those provisions meaningless. It stated, "[m]ore importantly, a reading of the policy as a whole makes it clear that the general tenor of the policy is coverage for catastrophe or calamity and not to provide for loss simply caused by either the passage of time or the use of inferior building materials." We are not persuaded by this reasoning.

If Hartford did not intend to create a reasonable expectation of coverage for collapse due to "natural decline," it could have used a term other than "decay." More limited terminology was certainly available to the insurer.

The exclusion for "wear and tear" does not impose or imply a restriction on the coverage for collapse caused by "hidden decay." The "wear and tear" exclusion is immediately followed by an exclusion for damage caused by "rust, corrosion, fungus, *decay*, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself." (Italics added.) There is also an exclusion for "[c]ollapse, except as provided below in the Additional Coverage for Collapse." Obviously, Hartford's collapse coverage was not meant to be limited by the generally applicable policy exclusions.

The meaning of the statement in the collapse coverage provisions that "[c]ollapse does not included [*sic*] settling, cracking, shrinkage, bulging or expansion" is not immediately clear. It is difficult indeed to imagine a building collapsing without any of these symptoms appearing. The only

reasonable interpretation of this language is that *mere* settling, cracking, shrinkage, bulging or expansion is not enough—there must also be an actual or imminent collapse of the structure. (*Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co., supra,* 60 Cal.App.4th at pp. 405-406.) Therefore, this provision does not militate against a reasonable expectation of coverage for imminent collapse caused by cracking resulting from hidden, gradual deterioration.

We agree with the trial court that the collapse coverage contemplates a catastrophic or calamitous event—the actual or imminent collapse of a building will always meet that description. But the policy clearly includes causes of collapse that typically occur gradually, such as "[h]idden insect or vermin damage," and "water damage." "Hidden decay" in the form of a gradual loss of strength in wooden timbers is not so different in kind from these causes as to deviate from the intended scope of Hartford's collapse coverage. Moreover, the collapse of Stamm's theater cannot be attributed simply to the passage of time. Stamm's wood expert, Stephen Quarles, believed the roof trusses gave way because of deterioration at the cellular level caused by the migration of water molecules in and out of the wood over the years, as the ambient humidity level fluctuated. It was not unreasonable for Stamm to expect coverage for "hidden decay" caused by such progressive physical deterioration, given the dictionary definition of "decay" as gradual deterioration to a weakened state.

Finally, the trial court's reference to "inferior building materials" properly relates to concerns addressed in the policy provision covering collapse caused by defective materials or construction methods, but only if the collapse occurs during the course of construction. However, Hartford did not seek summary adjudication based on that provision, probably because its application would involve triable issues of fact. As Stamm pointed out below, its theater conformed with all applicable building regulations when it was constructed, and the building had stood for 49 years. Quarles acknowledged that knots in the wood were a contributing factor, but assigned primary significance to the gradual loss of strength caused by humidity changes. Coverage under Stamm's all-risk first party property insurance policy depends on whether a covered risk was the efficient proximate cause of the loss. (*State Farm Fire & Casualty Co. v. Von Der Lieth* (1991) 54 Cal.3d 1123, 1131-1132 [2 Cal.Rptr.2d 183, 820 P.2d 285, 30 A.L.R.5th 786]; *Pieper v. Commercial Underwriters Ins. Co.* (1997) 59 Cal.App.4th 1008, 1018-1020 [69 Cal.Rptr.2d 551].) If the trial court meant to suggest that the collapse in this case was caused by defective materials, it erred by predetermining an issue of fact that was not resolved by the parties' moving and responding papers.

"[W]e cannot escape the rule that words in an insurance policy are to be construed in their ordinary sense, even if that sense provides a definition a little less tidy than some litigants, and perhaps the courts, might desire. When ordinary people do not understand the meaning of a word . . . . [t]hey turn to a dictionary." (*Scott v. Continental Ins. Co., supra,* 44 Cal.App.4th at p. 30, fn. omitted.) Stamm, after consulting any dictionary, would have good reason to be optimistic about its insurance coverage in this case. Hartford could have limited its collapse coverage for hidden deterioration to damage caused by organic decomposition. Its choice of the general term "decay" is the source of any ambiguity arising from the coexistence of the broader and more limited definitions of the word. "Because the insurer writes the policy, it is held 'responsible' for ambiguous policy language, which is therefore construed in favor of coverage." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) Thus, it was error to grant summary adjudication on the ground that Stamm could not show the collapse was the result of "hidden decay."

2. *The Attacks on the Verdict Are Meritless**

. . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The ruling granting Hartford summary adjudication is reversed. The judgment entered on the jury's verdict is affirmed. Stamm shall recover its costs on appeal.

McGuiness, P. J., and Corrigan, J., concurred.

The petition of respondent Hartford Casualty Insurance Company for review by the Supreme Court was denied January 23, 2002.

---

*See footnote, *ante*, page 531.