[No. B164112. Second Dist., Div. Three. Mar. 18, 2004.]

MARY ANN JORDAN, Plaintiff and Appellant, v.
ALLSTATE INSURANCE COMPANY, Defendant and Respondent.

1208

CounSEL

Richards, Watson & Gershon, Erwin Adler; Appellate Resources Group and James V. Jordan for Plaintiff and Appellant.

MacGregor & Berthel, Gregory Michael MacGregor, Deborah A. Berthel and Joshua N. Willis for Defendant and Respondent.

OPINION

**CROSKEY, J.**—Appellant Mary Ann Jordan seeks the reversal of a summary judgment granted to the respondent Allstate Insurance Company (Allstate) on her first amended complaint for breach of contract, breach of the implied covenant of good faith and fair dealing and declaratory relief. The trial court determined that the homeowner's insurance policy issued by Allstate to Jordan did not provide coverage for the loss she had sustained as the result of the alleged "collapse" of a portion of her Santa Monica home.

■ By its terms, the policy expressly provided "additional coverage" for any loss due to an "entire" collapse caused by "hidden decay." The policy also contained an exclusion for any loss caused by "wet or dry rot." We conclude that, in the factual context of this case, such conflicting policy language created an ambiguity that must, for the reasons discussed, be resolved against Allstate. We therefore will reverse the summary judgment granted by the trial court and remand with directions for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

In August of 2000, Jordan purchased a Deluxe Plus Homeowner's Policy (No. 037803085) from Allstate that provided coverage for her 70-year-old Santa Monica home. The policy provided "all-risk" coverage of up to $194,792 (for the dwelling) and $19,479 (other structures).

As is common in such policies, it was subject to certain exclusions. Particularly relevant to the issues before us, the policy provided that it did *not* cover (1) a loss consisting of or caused by ". . . rust or other corrosion, mold, *wet or dry rot*" (italics added) or (2) a "loss to [covered] property consisting of or caused by *collapse*." (Italics added.) There was an *exception* to this "collapse" exclusion, however, that was set out in a section of the policy headed by the term "additional coverage." This section provided that the policy would nevertheless cover:

"a) the *entire* collapse of a covered building structure;

"b) the *entire* collapse of a part of a covered building structure; and

"c) direct physical loss to covered property caused by (a) or (b) above." (Italics added.)

This exceptional "additional coverage" was limited to the collapse of a building structure specified in (a) or (b) that was "a sudden and accidental direct physical loss caused by one or more of the following: [¶] . . . [¶] b) hidden decay of the building structure; [¶] [and] . . . f) defective methods or materials used in construction, repair, remodeling or renovation, but only if the collapse occurs in the course of such construction, repair, remodeling or renovation." The term "collapse," however, did *not* include "settling, cracking, shrinking, bulging or expansion."

On or about December 20, 2000, Jordan was advised that there was evidence of damage to her home that had been caused by a water-conducting fungus known as Meruliporia incrassata (Poria). She received this information in a report prepared by Jose Luis DeLaCruz of DeLaCruz Wood Preservation Services.[1]

Jordan had contacted DeLaCruz after she discovered, on December 10, 2000, that a window had fallen out of the wall of her living room. She also observed that the floorboards in a corner of the living room were "giving way."[2] Following receipt of DeLaCruz's report, Jordan submitted a claim to which Allstate responded with a letter to Jordan, dated December 26, 2000, acknowledging her submission of the claim but reserving all of its rights. Allstate also promptly retained its own experts to conduct an inspection of Jordan's property. Those experts likewise determined that the damage that had been sustained to Jordan's home was the result of an infestation of the Poria fungus.

On or about January 12, 2001, Jordan hired P.W. Stephens, Inc. (P.W. Stephens) to conduct a fungi abatement and remediation on her property.[3]

---

[1] DeLaCruz is a state licensed pest inspector and was the expert relied upon by Jordan in this matter.

[2] In his report, DeLaCruz had noted that the Poria fungus was found "in the subfloor, in the rim joist and in the section of the girder of the side of the dwelling." He also found it in the jams and trims above the side window of the living room and that the damage had extended to the wood members in the concealed areas of the wall. With respect to the area of the living room floor that had "given way," DeLaCruz warned that "[e]xtreme caution should be exercised during the opening of the floor as this section of the substructure is [*sic*] *imminent* danger of collapse." (Italics added.)

[3] Allegedly as the result of some defective trenching performed by P.W. Stephens, the "possibility" was created of an "*imminent* collapse" of a mason block wall running along Jordan's property line. She submitted a supplemental claim for the cost of repair to this wall on

Performance of that work has led to a dispute between Jordan and P.W. Stephens that is not relevant to the issues which we resolve in this case.

On January 19, 2001, Allstate advised Jordan that it rejected her claim, primarily on the ground that coverage was precluded under the exclusion for any loss consisting of or caused by ". . . rust or other corrosion, mold, wet or dry rot." Jordan responded that the Poria fungus did not fall within the term "wet or dry rot" and asked that Allstate reconsider its coverage decision. On February 5, 2001, Allstate advised Jordan that "Poria fungus and the resulting damage are considered wet or dry rot" and her loss was therefore excluded under the policy.

Thereafter, on August 27, 2001, Jordan filed this action.[4] After the conclusion of certain discovery matters, Jordan moved for summary adjudication of her breach of contract claim and Allstate moved for summary judgment on Jordan's entire complaint. The issue presented to the trial court, under the facts and the relevant language of Allstate's policy, was whether coverage for the loss claimed by Jordan was excluded. The court denied Jordan's motion and granted Allstate's. That ruling was based on two conclusions reached by the trial court: (1) the broad general policy exclusion for losses due to wet or dry rot included the fungal infestation that had caused Jordan's claimed damages and (2) the coverage for collapse upon which Jordan relied did not extend to the "imminent collapse" of a portion of Jordan's home that was demonstrated by the record.

Jordan has filed this timely appeal.

### CONTENTIONS OF THE PARTIES

Jordan asserts essentially two principal arguments. First, she claims that she is entitled to coverage under the "collapse" provisions of Allstate's policy irrespective of the cause of such collapse. Put another way, she contends that even if the Poria fungus that invaded her home falls within the exclusion for "wet or dry rot," she is still entitled to coverage under the separate "collapse" provision. Second, Jordan argues that Poria fungus does *not* fall within the

---

March 13, 2001. In addition, Jordan claimed that such trenching also had the effect of weakening the lateral support for her house and that it was *also* in danger of *imminent* collapse.

[4] Jordan filed her first amended complaint on January 18, 2002, and that is the operative pleading before us. As already indicated, she sought recovery for breach of contract, breach of the implied covenant of good faith and fair dealing (i.e., "bad faith") and declaratory relief.

policy's exclusion for wet or dry rot. In support of that argument, Jordan relies upon the declaration testimony of her expert (DeLaCruz), claiming that declaration would have raised a triable issue of fact but for the trial court's erroneous ruling sustaining Allstate's objection to that declaration on the ground of a lack of foundation.

Allstate disputes each of these arguments and contends that well-settled principles of policy construction establish that the "wet or dry rot" exclusion is dispositive of Jordan's claim without regard to the separate coverage ground based on collapse. Allstate further argues that the trial court properly excluded the testimony of Jordan's expert and, in any event, the plain meaning, to a layperson, of the exclusionary term "wet or dry rot" necessarily embraces the fungus that caused the damage to Jordan's home. Next, even if Jordan's collapse claim were considered, recent Supreme Court authority establishes that Jordan's evidence of damage demonstrated nothing more than a condition of "imminent collapse" and thus was not sufficient to provide a basis for coverage, given the language of Allstate's policy.

## DISCUSSION

### 1. *Standard of Review*

█ Summary judgment is granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 741 [41 Cal.Rptr.2d 719].) █ After examining documents supporting a summary judgment motion in the trial court, this court independently determines their effect as a matter of law. (*Hulett v. Farmers Ins. Exchange* (1992) 10 Cal.App.4th 1051, 1057–1058 [12 Cal.Rptr.2d 902].) Where the facts are undisputed, the court can resolve the question of law in accordance with general summary judgment principles. (*Adams v. Paul* (1995) 11 Cal.4th 583, 592 [46 Cal.Rptr.2d 594, 904 P.2d 1205].) "Absent a *factual* dispute as to the meaning of policy language, [] the interpretation, construction and application of an insurance contract is strictly an issue of law." (*Century Transit Systems, Inc. v. American Empire Surplus Lines Ins. Co.* (1996) 42 Cal.App.4th 121, 125 [49 Cal.Rptr.2d 567].) As we explain below, the disposition of this case turns upon our conclusion that an ambiguity was created by conflicting policy language contained in an exclusion on the one hand, and a provision for "additional coverage" on the other. We therefore begin by reviewing relevant general principles of policy interpretation.

## 2. *Relevant Principles of Insurance Policy Interpretation*

In *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807 [274 Cal.Rptr. 820 799 P.2d 1253], the Supreme Court explained, "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' (*id.*, § 1644), controls judicial interpretation. (*Id.*, § 1638.) Thus, if the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.] [¶] If there is ambiguity, however, it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. (Civ. Code, § 1649.) If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. (*Id.*, § 1654.)" (*Id.*, at pp. 821–822.)

In 1992, the Supreme Court amplified on these principles in *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545]. In that case, the court noted that "[w]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. . . . The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. . . . If contractual language is clear and explicit, it governs. . . . On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' . . . This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, '*the objectively reasonable expectations of the insured.*' . . . Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. . . . [¶] In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. . . . This is because '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' " (*Id.* at pp. 1264–1265, citations omitted.)

The *Bank of the West* court made it clear that in order to conclude that an ambiguity exists which will be construed against an insurer, it is necessary

first to determine whether the coverage under the policy, which would result from such a construction, is consistent with the insured's *objectively reasonable expectations*. In order to do this, the disputed policy language must be examined *in context* with regard to its intended function in the policy. (*Bank of the West, supra,* 2 Cal.4th at p. 1265; see also *Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1106 [37 Cal.Rptr.2d 508].) This requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and "common sense." (*Bank of the West, supra,* 2 Cal.4th at pp. 1265, 1276.)

■ An insurance policy provision is ambiguous when it is capable of two or more constructions, both of which are *reasonable*. (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) The uncertainty may relate to the extent or existence of coverage, the peril insured against, the amount of liability or the party or parties protected. (See *Continental Cas. Co. v. Phoenix Const. Co.* (1956) 46 Cal.2d 423, 437–438 [296 P.2d 801] and cases cited there.) As indicated, the language in an insurance policy is "interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Thus, the proper question is whether the particular phrase is ambiguous in "the context of *this* policy and the circumstances of *this* case. [Citation.] 'The provision will shift between clarity and ambiguity with changes in the event at hand.' [Citation.]" (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co., supra,* 5 Cal.4th 854, 868.) This question must be answered through the eyes of a reasonable person in the position of the insured. (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666–667 [42 Cal.Rptr.2d 324, 913 P.2d 878].) "Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them. Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].)

■ Policy exclusions are strictly construed. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648 [3 Cal.Rptr.3d 228, 73 P.3d 1205].) Exceptions to exclusions on the other hand, are broadly construed in favor of the insured. (*Aydin Corp. v. First State Ins. Co.* (1998) 18 Cal.4th 1183, 1192 [77 Cal.Rptr.2d 537, 959 P.2d 1213].) As a result, " 'an insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again "any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect." [Citation.] Thus, "the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language." [Citation.] The exclusionary clause "must be *conspicuous, plain and clear.*" ' [Citation.]

This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded. [Citation.] The burden is on the insured to establish that the claim is within the basic scope of coverage and on the insurer to establish that the claim is specifically excluded. [Citation.]" (*MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 648.)

### 3. The Exclusion for "Wet or Dry Rot" Applies to Damage Caused by Fungus

Applying the foregoing principles of policy interpretation, we are persuaded that Allstate's exclusion for "wet or dry rot" includes the Poria fungus that attacked and damaged Jordan's home.

We agree with the comment set out in Allstate's brief that few laypersons would be familiar with the term "Poria," much less the full name of the fungus to which it refers. But it seems likely that a layperson would describe the decay caused by the fungus as "dry rot."[5] Certainly, that was the effect of sworn deposition testimony given by DeLaCruz, Jordan's own expert, in another case, a copy of which was presented to the trial court by Allstate in support of its motion.[6]

---

[5] For that reason, we reject Jordan's contention that any relevant analysis of the "ordinary and popular meaning" of dry rot must demonstrate a connection in the public mind between Poria and dry rot. That there may be technical arguments between scientific experts on this point is not relevant to the question of the *ordinary* and *popular* meaning of dry rot.

[6] In a deposition, given on August 15, 2001 in an unrelated case, DeLaCruz testified:

"Q You are a licensed pest inspector with a State, correct? [¶] A Correct. [¶] Q Is dry rot a term that you are ever using as a pest inspector? [¶] A *We have to use it because the consumer has already identified with that phrase. So in our reports, many companies continue to express the presence of decay as dry rot. There are many things that are associated with the associated with the* [sic] *consumer and how easy it can be for* them to understand in the lay terms. So lay terms—*dry rot is a lay term for* decay, *damage by fungus inspections* [sic—*infections*]. [¶] Q Lay term—dry rot is what? I'm sorry? [¶] A Dry rot is the lay person's term for decay or for rot, r-o-t. [¶] Q And what is your term for that? [¶] A Decay or damage by fungus infection. [¶] Q *So what did you use to describe the Poria here?* [¶] A *This one I'm using damage by water conducting fungus, Meruliporia, Poria incrassata.* [¶] Q *So let me just make sure I understand. In your profession as a pest inspector—am I saying that correctly? Pest Control Operator. I apologize. Let me rephrase it and start a new paragraph here.* [¶] *In your profession as a Pest Control Operator, do you find that lay persons, because they understand the term 'dry rot,' that dry rot is the term, the lay term, for decay or rot?* [¶] A *Correct.* [¶] Q And you prefer to use terms like decay or—Damage by fungus infection.—damage by fungus infection. You don't ever like to use the word 'dry rot'; is that correct? [¶] A I don't like to use it that often. Sometimes when I have people that cannot understand any other terms, I will use it so they can understand. But I try to tell them. [¶] Q *Is Poria a type of fungus?* [¶] A *It's definitely a fungus, yes.* [¶] Q *Is the damage you saw in the house at 988 Glen Oaks, was it damage by fungus infection?* [¶] A *Yes.* [¶] Q *And is it your testimony that dry rot is the term that many Pest*

This common understanding of the term "dry rot" is confirmed by Webster's Third New International Dictionary (1966): "dry rot *n.* **1 :** a decay of seasoned timber caused by certain fungi (as the house fungi and some polypores) that consume the cellulose of wood leaving a mere soft skeleton that is readily reduced to powder **2 :** a rot of plant tissue in which the affected areas are not soft and wet but dry and often firmer than normal or more or less mummified: as **a :** decay of standing timber involving such rot and caused chiefly by polypores . . . **3 :** a fungus causing dry rot . . . ."

■ It is well settled that in order to construe words in an insurance policy in their "ordinary and popular sense," a court may resort to a dictionary. (*Scott v. Continental Ins. Co.* (1996) 44 Cal.App.4th 24, 29 [51 Cal.Rptr.2d 566]; see also *Stamm Theatres, Inc. v. Hartford Casualty Ins. Co.* (2001) 93 Cal.App.4th 531, 543 [113 Cal.Rptr.2d 300].) In looking to dictionary definitions, however, courts must take care to consider the policy context in which the word or term was used and attempt to put itself in the position of a layperson and understand how he or she might reasonably interpret the particular language. (*MacKinnon v. Truck Ins. Exchange, supra,* 31 Cal.4th at p. 649.) We believe our conclusion regarding the layperson's understanding of the term "dry rot" is consistent with that admonition.

Jordan seeks to counter that conclusion by reliance on a declaration from DeLaCruz that she filed in support of her opposition to Allstate's motion. In that declaration, DeLaCruz identified himself as a state licensed pest control operator with 30 years of experience. He explained that he tried to "avoid using the term 'dry rot' and [does] not use it at all to describe the decay caused by Poria." Allstate, however, objected to DeLaCruz's declaration on the ground that it lacked a proper foundation demonstrating that he was qualified to express an opinion as to whether Poria was properly embraced in the term "dry rot." The trial court sustained that objection.[7] Arguably, this

_____

*Control Operators use to describe damage by fungus infection because dry rot is the lay person's term for decay? [¶] A Yes."* (Italics added.)

[7] The trial court explained this ruling in very considerable detail in the same minute order that granted the summary judgment before us (and in which the court also outlined DeLaCruz's description of his experience and claimed expertise). We set forth the trial court's ruling verbatim:

"Luis DeLaCruz states as his expert opinion testimony that the cause of the Plaintiff's property damage was 'an attack of Poria . . . not "mold, wet or dry rot" ' He expressly bases his opinion on his professional experience, that he is a licensed pest control operator in California; has over 30 years experience in the pest control industry; has conducted more than 1200 field investigations of Poria-related damage engaged in extensive case review, reading and discussion (without identifying a single case or publication). Mr. DeLaCruz further based his opinion on the following: vague, unauthenticated and inadmissible hearsay references to his experience as a trainer or continuing education provider in the field of Poria; inadmissible hearsay letters of appreciation for his contributions to understanding Poria. [¶] This general experience and substantially inadmissible information is insufficient to establish Mr. DeLaCruz as an expert on

was error as DeLaCruz's declaration did provide sufficient facts to establish a foundation for the expression of his opinion. (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 37–38 [210 Cal.Rptr. 762, 694 P.2d 1134].) As the *Mann* court explained, ". . . the determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and 'no hard and fast rule can be laid down which would be applicable in every circumstance.' [Citation.] Where a witness has disclosed sufficient knowledge, the question of the degree of knowledge goes more to the weight of the evidence than its admissibility. [Citation.]" (*Id.* at p. 38.)

DeLaCruz's declaration was sufficient to demonstrate a "special" knowledge of the subject matter of the Poria fungus. The weight and value of his opinion would be a matter for the trier of fact, but it should not have been rejected on the ground asserted by Allstate. (See, generally, *Brown v. Colm* (1974) 11 Cal.3d 639, 645–647 [114 Cal.Rptr. 128, 522 P.2d 688].) To the extent that this was error, however, it was harmless.

■ Expert testimony is not generally admissible on the question of the meaning of particular policy language. (*National Auto & Casualty Ins. Co. v. Stewart* (1990) 223 Cal.App.3d 452, 458–459 [272 Cal.Rptr. 625] ["The opinion of a linguist or other expert as to the meaning of the policy is irrelevant to the court's task of interpreting the policy as read and understood by a *reasonable lay person*" (italics added)]; see also *Cooper Companies v. Transcontinental Ins. Co., supra,* 31 Cal.App.4th 1094, 1100 [37 Cal.Rptr.2d

---

the cause of the damage to Plaintiff's property. There is nothing in Mr. DeLaCruz's declaration to show special knowledge about Poria or mold or wet or dry rot. He fails to explain the significance, if any, of being a licensed pest control operator. What training, if any, must one have to be licensed? What record must a licensee demonstrate to maintain his license? What sort of specific work has Mr. DeLaCruz performed during his 30 years experience in the pest control industry? What are field investigations? How often has he encountered poria or mold or wet or dry rot? What cases has he reviewed? What has he read? With whom has he had discussions and on what subjects? These, and many more questions must be answered satisfactorily in order for Mr. DeLaCruz to qualify as an expert on the cause of the damage to plaintiff's property. [¶] In contrast to the lack of specificity of breadth or depth in Mr. DeLaCruz's credentials to testify as an expert in this case, the Defendant offers by declaration opposing expert testimony of Barry S. Goodell, PhD. In that declaration Dr. Goodell provides his specific and extensive knowledge, experience and education as the basis for his opinion that the term 'dry rot' properly describes 'Poria.' That basis includes that: he is a professor of wood science and technology/forests products laboratory at the University of Maine; his areas of professional expertise include decay fungi and protection of wood from environmental degradation; he has made 200 publications and presentations in the field of wood deterioration and protection; he reviewed numerous identified professional publications on dry rot and microbiological degradation."

508]; *Pieper v. Commercial Underwriters Ins. Co.* (1997) 59 Cal.App.4th 1008, 1017 [69 Cal.Rptr.2d 551].)[8]

■ As we have explained, it is the court's function to interpret policy language as a matter of law where, as here, there is no dispute as to the words used in the policy. In making such interpretation, the court is required to do so through the eyes of a reasonable lay person, not those of a lawyer, an insurance specialist, an expert in wood science or a pest control operator. (*Montrose Chemical Corp. v. Admiral Ins. Co., supra,* 10 Cal.4th at pp. 666–667; *Crane v. State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129].) DeLaCruz's declaration (contrary to his earlier deposition testimony) did not provide any assistance to the court with respect to a *layperson's* common understanding of the term "dry rot." Moreover, nothing that DeLaCruz said suggested or tended to show that the term "dry rot" had a particular or technical meaning understood by the parties at the time the policy was issued or that his particular reluctance to use the term was sufficient to demonstrate that it included certain types of fungus and not others. (See, generally, *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1356–1358 [8 Cal.Rptr.3d 649].)

It appears clear to us that a layperson's understanding of the term "wet or dry rot" embraces damage or decay caused by a fungus. Since Poria is admittedly a fungus, we would have no trouble concluding that the Poria fungus that damaged Jordan's home fell within the policy exclusion for "wet or dry rot."[9] But that is only true if we read the terms of that exclusion in isolation. When read in the context of the entire policy, however, such clarity disappears. Thus, we do not agree with Allstate's contention that reliance on the exclusion for "wet or dry rot" is sufficient to resolve Jordan's claim in Allstate's favor.

### 4. There Is an Ambiguity Between the "Additional Coverage" Exception for Collapse and the Exclusion for "Wet or Dry Rot"

The Allstate policy provides, on a limited basis, "additional coverage" for "collapse." As we mentioned at the outset, the Allstate policy is an "all-risk"

---

[8] Similarly, statements of Allstate's claims personnel relied upon by Jordan regarding either the meaning or ambiguity of the term "dry rot" are not relevant. (See *Quan v. Truck Ins. Exchange* (1998) 67 Cal.App.4th 583, 601–602 [79 Cal.Rptr.2d 134].) This is so because, as we have already stated, the interpretation of a policy of insurance is a question of law; it is *not* a factual determination. (*Ibid.*)

[9] DeLaCruz's declaration did provide some evidence that a technical dispute apparently exists between experts as to whether a fungus can cause "dry rot." When his declaration and his quoted deposition testimony (see fn. 6, *ante*) are considered together, however, it is clear that DeLaCruz acknowledged that the layperson's understanding of the common meaning of "dry rot" is totally consistent with the conclusion that we reach here.

policy (i.e., it provides coverage for all risks of loss, *except those expressly excluded*). There are, however, two exclusions that are relevant to the resolution of this matter. The first is the one relating to "wet or dry rot" that we have already discussed. The second is for a "loss to [covered] property consisting of or caused by collapse." But the exception to that exclusion states that it does *not* apply if the requirements of the "additional coverage" for collapse have been met: an *entire* collapse of all or part of a covered building structure which is a sudden and accidental direct physical loss caused by (as far as is relevant here): (1) *hidden decay* of the building structure or (2) defective methods or materials used in construction, repair, remodeling or renovation (provided that the collapse occurs in the course of such construction, repair, remodeling or renovation).

Jordan makes two arguments with respect to her claim for coverage under this exception to the collapse exclusion. First, she contends that the Poria fungus and the damage it caused constituted "hidden decay." Second, she asserts that some part of the collapse resulted from and during the negligent trenching work of P.W. Stephens whom she had retained to remediate her Poria fungus problem. We need discuss only the first of these arguments.[10]

The exception to the collapse exclusion is described in a section of the policy designated as "additional coverage" and applies to a loss caused by an entire collapse that is due to "hidden decay." There is evidence in this case that the damage caused by wet or dry rot was found in wood members in the concealed area of the wall (see fn. 2, *ante*). As our discussion of the dictionary definition of "dry rot" made clear, that term necessarily involves "decay." Thus, the use of the term "dry rot" in the exclusion and the use of the term "hidden decay," in the provision for "additional coverage" lead to a confusing contradiction. Such contradiction creates an ambiguity with respect to coverage involving a claim of collapse. Given our obligation to read the Allstate policy so as to give full effect to *all* of its terms and conditions (Civ. Code, § 1641; *Holz Rubber Co. Inc. v. American Star Ins. Co.* (1975) 14 Cal.3d 45, 56–57 [120 Cal.Rptr. 415, 533 P.2d 1055]), we might reconcile this contradiction in one of two ways. First, we could conclude that a collapse due to "hidden decay" would be covered, but not if such decay was caused by "wet or dry rot"; or, second, we could conclude that coverage for a collapse due to "hidden decay" was provided, but *noncollapse* damage caused by "wet or dry rot" was excluded. Each of these constructions of the policy language is reasonable. The first is consistent with Allstate's contention that the exclusion for "wet or dry rot" precludes coverage irrespective of whether there is a basis for coverage under the exception to the collapse exclusion. On

---

[10] Jordan's second argument does not involve a matter of policy interpretation, but rather unresolved factual questions which will have to be answered upon remand by a trier of fact (see fn. 11, *post*).

the other hand, the second interpretation is advanced by Jordan and supports her claim for coverage under the collapse provisions of the "additional coverage" section of the policy. Thus, when read in the context of the entire policy, particularly the provision granting coverage for a collapse caused by "hidden decay," the effect and application of the exclusion for a loss caused by wet or dry rot is not at all clear.

 When presented with such a conflict between competing policy provisions, it is our obligation to attempt to resolve the resulting ambiguity by first looking to the *objectively reasonable* expectations of Jordan, the insured. When the "dry rot" exclusion is read in the context of the entire policy, particularly the exclusion for collapse and the "additional coverage" exception thereto, an insured could reasonably conclude that while the "dry rot" exclusion will *generally* preclude coverage for damage caused by a fungus, the exception to the collapse exclusion will counter that and provide coverage for a *collapse* caused by "hidden decay." Since dry rot is a form of decay (*Stamm Theaters, Inc. v. Hartford Casualty Ins. Co., supra,* 93 Cal.App.4th at pp. 539–540), coverage would be reasonably expected. Put another way, an insured's objectively reasonable expectation of coverage could arise from a reading of the entire policy in context because the "collapse" exception for "decay" will justify coverage for a collapse caused by "dry rot," even if noncollapse damage caused by dry rot is excluded. That being so, we must resolve the ambiguity by looking to the objectively reasonable expectations of the insured and construing the policy language consistent therewith and against the insurer. (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at pp. 1264–1265; see also *E.M.M.I., Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 474–475 [9 Cal.Rptr.2d 701, 84 P.3d 385].)

The evidence presented with respect to Allstate's summary judgment motion demonstrated that the "decay" caused by the Poria fungal infestation and the resulting "dry rot" was "hidden"; thus, one of the two causal factors set out in the policy's collapse exception and relied upon by Jordan has been satisfied.[11] Our resolution of this issue of policy construction in Jordan's favor, however, does not fully answer the question as to the existence of coverage.

---

[11] The existence of the other causal ground (i.e., defective methods or materials used in the "repair" of Jordan's home) may or may not be established by additional evidence. The trial court never reached this issue in light of its conclusion that the "wet or dry rot" exclusion precluded coverage in any event. This issue, which is essentially a factual matter, may be considered and resolved upon remand.

### 5. Whether the "Entire Collapse" Requirement for Coverage Under the Collapse Exception Can Be Satisfied Presents Unresolved Issues of Fact

The collapse exception expressly provides that there will be additional coverage for an *entire* collapse of all or a part of a building. Although we have resolved the ambiguity problem created by the "dry rot"/"hidden decay" conflict, that only permits us to conclude that the trial court erred in relying on the "wet or dry rot" exclusion to summarily find that there was no coverage under the Allstate policy. Whether Jordan can demonstrate the existence of coverage under the provisions of the collapse exception involves factual questions that remain to be resolved. The trial court did not actually reach these issues and we are not satisfied that the record before us is sufficient to enable us to resolve them as a matter of law.[12] If the collapse portion of the "additional coverage" provision is read to require an "actual" collapse, then a state of "imminent" collapse would not support Jordan's claim. (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1078 [135 Cal.Rptr.2d 361, 70 P.3d 351].)

As we have already discussed, Jordan presented evidence that a window fell out of her house and a portion of a floor "gave way." On the other hand, her expert, DeLaCruz, referred to a concern about a risk of *imminent* collapse. Did the condition of Jordan's home involve an actual collapse or only an imminent one? Neither party properly addressed this question with appropriate evidentiary support. What does it mean for a floor to "give way"? How should a window falling out be characterized? We can conclude, as we do below, that Allstate's policy requires an "actual" collapse, but we have no way of determining if that happened here. That will be a job for the trier of fact on remand.

It seems self-evident that the policy's use of the term "entire" collapse necessarily must refer to an actual, not an imminent collapse. For a building or a portion thereof to sustain an "entire collapse" must mean that it has *entirely* collapsed, that is "wholly," "completely," or "fully." (See Webster's 3d New Internat. Dict. (1966).) Put another way, to constitute an "entire collapse," there must be a "total collapse." It would make no sense to apply such a description to a collapse that was merely "imminent." Whether a potential collapse that is properly described as "imminent" will result in an entire or total collapse or something less, or no collapse at all, is a matter of pure speculation unless and until such collapse *actually* occurs.

---

[12] Although the trial court purported to conclude that there was no "entire" collapse (but, at most, an "imminent" one), we are not satisfied that such a conclusion is adequately supported by this record. Declarations describe a window falling out and flooring "giving way" but also contain ambiguous conclusionary references to "imminent" collapse. Such evidence is not sufficient to justify a summary resolution of the issue.

Jordan relies upon two cases that do not support her position. In *Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co.* (1997) 60 Cal.App.4th 400 [70 Cal.Rptr.2d 260], the relevant policy language provided that the insurer would provide coverage for "loss or damage caused by or resulting from *risks* of direct physical loss involving collapse . . . ." (*Id.* at p. 405, italics added.) This language clearly did not limit coverage to *actual* collapse but necessarily embraced *imminent* collapse. The court found the language ambiguous and, applying settled principles, concluded that it created in the insured an objectively reasonable expectation of coverage for both an imminent as well as an actual collapse. (*Id.* at p. 405.) Put another way, the promise of coverage for a "risk" of loss was broad enough to embrace the *threat* of loss from an imminent collapse.

The case of *Stamm Theatres, Inc. v. Hartford Casualty Ins. Co., supra,* 93 Cal.App.4th 531, presented a similar problem in that it also had policy language providing coverage for "*risks* of direct physical loss *involving* collapse." (*Id.* at p. 535, italics added.) Relying on the analysis of similar policy language set out in *Doheny West,* the insurer in *Stamm* conceded that the policy provided coverage for imminent as well as actual collapse. (*Stamm,* at p. 536.) In its opinion, the *Stamm* court agreed that this conclusion flowed from the broad scope of such policy language. (*Id.* at p. 542.)

As Allstate emphasizes (and as the trial court pointed out), these cases were not decided in the context of the same policy language that is before us. As we have discussed, the language used in the Allstate policy is far more narrowly drawn. It requires an "entire" collapse. In our view, the term "entire" collapse is susceptible of only one reasonable interpretation. That is the one the trial court adopted. Coverage under the collapse exception applied only to an *actual* collapse. (See *Rosen v. State Farm General Ins. Co., supra,* 30 Cal.4th at pp. 1075–1076.) Whether such a collapse occurred in this case is a factual matter that the trial court must resolve in the first instance.

## CONCLUSION

The trial court erred in concluding, as a matter of law, that there was no coverage under Allstate's policy for the loss sustained by Jordan. While the "additional coverage" collapse exception may provide a basis for coverage under Allstate's policy in spite of the "wet or dry rot" exclusion, unresolved questions of fact remain as to whether Jordan is actually entitled to such coverage. The trial court neither addressed nor resolved those underlying factual questions. We will therefore reverse and remand to give the trial court an opportunity to decide these matters.

## *DISPOSITION*

The judgment is reversed. This matter is remanded for further proceedings consistent with the views expressed herein. Jordan shall recover her costs on appeal.

Klein, P. J., and Kitching, J., concurred.