**HUMBOLDT BANK, Plaintiff,**

v.

**GULF INSURANCE COMPANY, Defendant.**

No. C–03–1799–SC.

United States District Court, N.D. California.

June 3, 2004.

John F. Friedemann, Esq., Kyle M. Fisher, Friedemann O'Brien Goldberg & Zaria, Santa Rosa, CA, for Plaintiff.

David Taylor DiBiase, Esq., Gary J. Valeriano, Mark Joseph Krone, Anderson, McPharlin & Conners, LLP, Los Angeles, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY ADJUDICATION OF ISSUES

CONTI, District Judge.

This dispute arises from the theft of $5.25 million belonging to Plaintiff Humboldt Bank ("Humboldt"). Humboldt initiated the present action claiming that this loss is covered through a bond issued by Defendant Gulf Insurance Company ("Gulf"), and that Gulf is liable for any unrecovered amounts. Gulf disagrees. Presently before the Court are Gulf's Motion for Summary Judgment or Summary Adjudication of Issues, and Humboldt Bank's Cross–Motion for Summary Adjudication of Issues. The Court, having reviewed the plain language of the bond along with the submissions and arguments of the parties, finds that this money is not covered by Humboldt's bond with Gulf. Accordingly, Gulf's motion for summary judgment is hereby granted, and Humboldt's cross-motion for summary adjudication is hereby denied.

## I. BACKGROUND

### A. The Stolen ATM Currency

This case concerns a common practice in the banking industry whereby banks allow owners of automated teller machines ("ATMs") to use the bank's vault cash for dispensement in the ATMs in exchange for interest and other fees on the money. In December of 2000, Tehama Bank [1] entered

---

1. This action is brought by Humboldt as the successor in interest to Tehama Bank as a

into an ATM vault cash agreement with an Independent Sales Organization ("ISO") named Direct Connect. The sole principal of Direct Connect was a man named Michael Schwartz ("Schwartz") who owned or leased a number of ATMs on the East Coast. In an effort to find cash for his ATMs, Schwartz applied for a Cash Services Agreement with Tehama in the latter part of 2000. As part of his application, Schwartz supplied Tehama with tax returns, financial statements, and submitted to on-site inspection of his business. Despite his dubious credit history and the fact that both of his companies were run out of his personal residence, Tehama entered into a Cash Services Agreement ("CSA") with Schwartz on December 21, 2000. The relevant portions of the CSA are as follows:

- Upon Schwartz's request, Tehama would supply currency for use in the ATMs. The funds were to be delivered to the ATMs by a third-party, armored service provider. *See* Ex. C to Barkley Decl. at §§ 2.1, 2.2.

- In exchange for use of the money, each month Schwartz would pay Tehama 11.5% of the average outstanding daily balance allotted to each ATM terminal, along with various other set fees. *Id.* at Ex. A.

- "Title to and the right to possession of all such currency [supplied by Tehama], unless and until paid to a customer lawfully withdrawing funds [from an ATM] ... shall at all times belong to [Tehama]." *Id.* at § 2.1.

- Upon termination of the agreement or the request of Tehama, Schwartz would immediately pay Tehama the full amount of any outstanding advances and fees. All such amounts not so paid following demand would thereafter bear interest at a rate of 18%. *Id.* at § 3.9.

One aspect of the relationship between Tehama and Schwartz warrants further discussion. Normally, banks do not deliver cash to ISOs directly. Generally speaking, the money is wire transferred to a correspondent bank, the money is then placed into cassettes and picked up by an armored carrier service. The armored carrier service then delivers the cash to the ATMs and inserts it into the machines. All of this is done without the ISO ever having access to the funds. *See* Def.'s Mot. For S.J. at 5. In the instant case, Tehama allowed Schwartz to use his own armored carrier service, Schwaz Armored LLC, to load his ATMs. Schwartz was the sole owner of Schwaz Armored LLC, which shared the same principal place of business as Direct Connect. Over the course of this relationship, Schwaz Armored was used to transport Tehama's cash to the ATMs and load it into the machines. Consequently, Schwartz was given direct access to the funds.

In or about April of 2001, pursuant to its merger with Tehama, Humboldt agreed to become the servicer for Tehama's ATM program. All contracts between Tehama and its ISOs, including Direct Connect, were transferred or assigned to Humboldt. Complaint, ¶ 12. Humboldt had a set policy against providing ISOs direct access to the funds being lent. Ex. 20 to Valeriano Decl. As a consequence, in or about August of 2001, Humboldt informed Schwartz that he would either have to procure another armored carrier to transport the

---

result of a merger between Humboldt and Tehama in June of 2002. Tehama Bank has been operating as a division of Humboldt Bank since that date. The references herein to Tehama refer and relate to the activities of Tehama in its capacity as Humboldt's predecessor in interest and are imputed to Humboldt for purposes of this motion. Complaint, ¶ 4.

cash or the relationship between Humboldt and Direct Connect would be terminated. *Id.* at Ex. 21. Humboldt's letter stated that if Schwartz decided "not to have a third party involved, please let this letter serve as [the bank's] 120–day notice of termination." *Id.* at Ex. 21. During this 120–day period, however, Humboldt satisfied cash-requests from Schwartz in the amount of $5.25 million. Schwartz then absconded with the bulk of this money and was later found dead in Florida. Gulf's Mot. For S.J. at 1. An investigation by the FBI and local authorities recovered approximately $3.7 million of this money which has been returned to Humboldt. Complaint, ¶ 15. Approximately $1.3 million remains outstanding.

### B. The Bond

Gulf issued a Financial Institution Bond, bond number GA0426583 (the "Bond" or the "Policy"), to Tehama effective August 23, 1999. Complaint, Ex. C. That Policy provides coverage for a variety of risks to the bank's currency including employee dishonesty, theft in transit, loss or theft of property "on premises", etc. *Id.* at p.1–2. The policy also contains a number of exclusions from coverage, and there is one in particular around which this case centers. Exclusion (e) provides in relevant part:

This bond does not cover:

(e) loss resulting directly or indirectly from the complete or partial nonpayment of or default upon

(1) any *loan,* or any *transaction in the nature of a loan,* including repurchase agreements, or *extensions of credit,* whether or not involving the Insured as a lender or borrower, or

(2) any false or genuine note, account, agreement, invoice or other evidence of debt assigned or sold to, discounted or otherwise acquired by the Insured,

whether the Insured's participation was procured in good faith or through trick, artifice, fraud or false pretense . . . .

*Id.* at p. 15 (emphasis added).

Exclusion (e) does not apply however if the loss was perpetrated by an "employee" of the bank. There are several categorical definitions of "employee" set forth in the Policy, and again, there is one in particular that is relevant to the present dispute. Subsection (g) under the definition of employee states in relevant part:

Employee means:

(g) any natural person and any organization authorized by the Insured to perform services for the Insured as electronic data processor of checks or negotiable orders of withdrawal or other accounting records of the Insured (hereinafter called "Processor") while performing such services. . . . A Federal Reserve Bank or clearing house, and customers of the Insured, shall not be deemed to be Processors.

*Id.* at p. 18.

### C. The Claim

On April 15, 2002, Humboldt submitted a Proof of Loss to Gulf claiming that the unrecovered portion of the money stolen by Schwartz was covered under the Bond. After a period of discovery and investigation, Gulf formally denied Humboldt's claim on January 8, 2003. Ex. Q to Fisher Decl. In asserting that no coverage existed for this loss, Gulf argued, *inter alia,* that the money given to Schwartz was a loan, in the nature of a loan, and/or an extension of credit, and therefore was not covered under the Policy. *Id.* Humboldt then initiated the present action asserting two claims against Gulf: (1) Breach of contract; and (2) Breach of the implied covenant of good faith and fair dealing. Humboldt contends this money is covered under the Bond because it was not in the nature of a loan or extension of

credit, and alternatively, that Schwaz Armored acted as a "data processor" for Humboldt and therefore the money would be covered even if it was deemed to be something in the nature of a loan. With respect to its second cause of action, Humboldt argues that Gulf's method of handling and ultimate decision on its claim under the Policy was unreasonable and conducted in bad faith. Complaint, ¶ 40.

Gulf now moves for summary judgment or, alternatively, summary adjudication. Gulf makes three primary arguments in its moving papers: (1) The money supplied by Humboldt for use in the ATMs falls within exclusion (e) and therefore is not covered under the Policy; (2) Neither Schwaz Armored nor Schwartz acted as a "data processor" for Humboldt; and (3) In the event that the Court does not grant summary judgment on the issue of coverage, Gulf is entitled to summary adjudication on the question of bad faith because its construction of the Policy language and treatment of Humboldt's claim was reasonable as a matter of law. Humboldt has filed a cross-motion for summary adjudication on the question of whether exclusion (e) applies to the loss which is the subject of this action. Having reviewed the parties' submissions, and for the reasons articulated below, the Court finds as a matter of law that: (1) Exclusion (e) is applicable to the loss which forms the basis of this action; (2) Neither Schwaz Armored nor Schwartz acted as a "data processor" for Humboldt; and (3) Gulf's handling of Humboldt's claim was reasonable and not conducted in bad faith. Accordingly, Humboldt's motion for summary adjudication is hereby denied, and Gulf's motion for summary judgment is hereby granted.

## II. *LEGAL STANDARD*

### A. *Summary Judgment*

A party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and they are entitled to judgment as a matter of law. *Aguilar v. Atlantic Richfield Co.*, 25 Cal.4th 826, 850, 107 Cal.Rptr.2d 841, 24 P.3d 493 (2001). There is no "genuine" issue concerning the facts if a reasonable fact finder could only come to one conclusion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party has the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.* 475 U.S. at 586, 106 S.Ct. 1348. The nonmoving party has the burden of producing operative facts, and the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, any inferences from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec.*, 475 U.S. at 587, 106 S.Ct. 1348.

Where the material facts are undisputed, the interpretation of an insurance policy is a question of law for the court. *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir.1998); *Ray v. Farmers Ins. Exch.*, 200 Cal.App.3d 1411, 1415–16, 246 Cal.Rptr. 593 (1988). As we explain below, in the case before us the material facts appear undisputed. This case turns on the purely legal question of the proper application of the Policy to the facts of this case. Therefore, summary judgment is the appropriate vehicle to resolve this dispute.

## B. Interpretation of Insurance Policy

■ Construction of an insurance policy is governed by state law. The principles by which insurance contracts are interpreted under California law are well worn, but nonetheless bear repeating. Under California law, to resolve a question of insurance policy interpretation, the court performs an independent review, looking first to the language of the policy in order to ascertain its plain meaning as a layperson would understand it. *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). Insurance policies are contracts and the goal of contractual interpretation is to determine and give effect to the mutual intention of the parties. *See Safeco Ins. Co. of America v. Robert S.*, 26 Cal.4th 758, 110 Cal.Rptr.2d 844, 28 P.3d 889 (2001). Such intent is to be inferred, if possible, solely from the written provisions of the contract. The "proper initial focus for resolving a question of insurance coverage is on the language of the insurance policy itself..." *Garriott Crop Dusting Co. v. Superior Court,* 221 Cal.App.3d 783, 790, 270 Cal.Rptr. 678 (1990). The provisions in a policy are interpreted in their "ordinary and popular" sense, unless used by the parties in a technical sense or a special meaning is given to them by usage. "Thus, if the meaning a layperson would ascribe to contractual language is not ambiguous, we apply that meaning." *AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 822, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990).

Where there is an ambiguity however, it is generally resolved by interpreting the ambiguous provisions "in accordance with the objectively reasonable expectations of the insured." *Farmers Ins. Exch. v. Knopp,* 50 Cal.App.4th 1415, 1417, 58 Cal. Rptr.2d 331 (1996). A policy provision is ambiguous if it is susceptible to "two or more reasonable constructions." *Safeco,* 26 Cal.4th at 763, 110 Cal.Rptr.2d 844, 28 P.3d 889. Ambiguity cannot be found in the abstract; rather, "language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case...." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. ins. Co.,* 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993). "Policies of insurance, like other contracts, must be read as a whole with each part being read in conjunction with other portions thereof." *Hartford Accident and Indemnity Co. v. Sequoia Ins. Co.,* 211 Cal.App.3d 1285, 1298, 260 Cal.Rptr. 190 (1998).

"Merely because a word or term is not specifically defined does not mean we strictly construe it against the insurer." *Fibreboard Corp. v. Hartford Acc. & Indem. Co.,* 16 Cal.App.4th 492, 509, 20 Cal. Rptr.2d 376 (1993). Rather, "the meaning of words ... is always subordinate to the meaning derived from the context, or from the circumstances under which the word is used." *Hollingsworth v. Commercial Union Ins. Co.,* 208 Cal.App.3d 800, 807, 256 Cal.Rptr. 357 (1989). Therefore, whereas a "reliance on [the] common understanding of language is bedrock," "[e]qually important are the requirements of reasonableness and context." *Bay Cities,* 5 Cal.4th at 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263; *Nationwide Mutual Insurance Co. v. Dynasty Solar, Inc.,* 753 F.Supp. 853, 856 (N.D.Cal.1990).

■ "An insurance company can choose which risks it will insure and which it will not, and coverage limitations set forth in a policy will be respected." *Fidelity & Deposit Co. v. Charter Oak Fire Ins. Co.,* 66 Cal.App.4th 1080, 1086, 78 Cal.Rptr.2d 429 (1998) (citing *Legarra v. Federated Mutual Ins. Co.* 35 Cal.App.4th 1472, 1480, 42 Cal.Rptr.2d 101 (1995)). However, it is also true that coverage clauses are generally interpreted broadly in favor

of coverage, whereas coverage exclusions are interpreted narrowly. *See London v. Medical Underwriters of California,* 2001 WL 1250104 at *4; *MacKinnon v. Truck Ins. Exchange,* 31 Cal.4th 635, 3 Cal. Rptr.3d 228, 238, 73 P.3d 1205 (2003). Moreover, an exception to an exclusion is "somewhat analogous to coverage provisions and ... [construed] broadly in favor of the insured." *National Union Fire Ins. Co. v. Lynette C.,* 228 Cal.App.3d 1073, 1082, 279 Cal.Rptr. 394 (1991).

### III. *DISCUSSION*

#### A. *Does Exclusion (e) Apply?*

■ Exclusion (e) of the Bond excludes all losses "resulting directly or indirectly from the complete or partial nonpayment of or default upon any loan, or any transaction in the nature of a loan ... or extensions of credit...." We find that this exclusion is unambiguous and therefore will apply it according to its terms. In doing so, we conclude that the loss sustained by Humboldt falls squarely within the category of risk elided from coverage by exclusion (e).

As we have explained, it is the court's function to interpret policy language as a matter of law where, as here, there is no dispute as to the words used in the policy. In making such interpretation, the court is required to do so through the eyes of a reasonable lay person. Here, a reasonable lay person looking at Humboldt's ATM Cash Program would conclude that the money given to Schwartz which forms the basis of this action was "in the nature of a loan" or an "extension of credit." As we have detailed, Humboldt agreed to let Schwartz make a productive use of its money in exchange for a fixed rate on the amount of money used in addition to other set fees and charges. *See* Ex. C to Barkley Decl. Schwartz was required to fill out an application that asked for many of the same materials requested in Humboldt's

Business Loan Application. *See* Exs. 39, 40 to Valeriano Decl. Upon termination of the agreement or the request of Humboldt, Schwartz agreed to immediately return the full amount of any outstanding advances or pay interest at a rate of 18% on such amounts. Looking at these factors, as well as the relationship as a whole, it appears commonsensical that this money was, at the very least, "in the nature of a loan" or an "extension of credit."

"It is well settled that in order to construe words in an insurance policy in their 'ordinary and popular sense,' a court may resort to a dictionary." *Jordan v. Allstate Ins. Co.,* ·116 Cal.App.4th 1206, 11 Cal. Rptr.3d 169, 177 (2004) (citing *Scott v. Continental Ins. Co.* 44 Cal.App.4th 24, 29, 51 Cal.Rptr.2d 566 (1996)); *Stamm Theatres, Inc. v. Hartford Casualty Ins. Co.* 93 Cal.App.4th 531, 113 Cal.Rptr.2d 300 (2001). The basic dictionary definition of "loan" is as follows: "money lent at interest," or "something lent for the borrower's temporary use on condition that it or its equivalent be returned," or "the grant of temporary use made by a lender." *Webster's Third New International Dictionary,* G & C Merriam Co.1976, p. 1326. "Credit" is defined as "the balance in a person's favor in an account; an amount or limit to the extent of which a person may receive goods or money for payment in the future," or "an amount or sum placed at a person's disposal by a bank...." *Id.* at p. 532. Finally, a court that has considered exclusion (e) has stated that a loan is "a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows." *IBM Poughkeepsie Employees Federal Credit Union vs. Cumis Insurance Society,* 590 F.Supp. 769, 775 (S.D.N.Y.1984). Applying such definitions to the facts of this case, the Court finds that the CSA between Direct Connect and Humboldt was structured in

the "nature of a loan" or an "extension of credit."

The Court's decision here is also consistent with the underlying intent and purpose of exclusion (e). As one commentator has stated, financial bonds in general allocate the risks of loss between an insurer and the financial institution:

> It is a compromise between insuring against certain risks and providing that coverage at a reasonable premium. To achieve this, credit risks (a natural result of lending money) stay with the financial institution. The loan exclusion accomplishes this goal by sweeping away all loan losses caused by fraud, no matter how pervasive the fraud, unless the loss falls within one of the narrow exceptions to the loan exclusion.

Karen Kohler Fitzgerald, Financial Institution Bonds 293 (Clore ed.2d ed. 1998 American Banking Association "ABA"). In discussing exclusion (e), the ABA has also stated that:

> Losses from non-payment of loans or other extensions of credit are often connected with false pretenses used when the loan or credit was obtained. However, Section 2(e) excludes such losses unless they are covered by employee dishonesty or forgery insuring agreements.

ABA "Digest of Bank Insurance," 6th ed.1991. Thus, it seems clear that exclusion (e) is intended to eliminate coverage for losses caused by bad loans or credit extensions. Exclusion (e) is in place because the writer of a bond does not want to be responsible for the actions of third-party borrowers. Here, Humboldt entrusted a third-party with temporary use of its money and suffered a loss when that person defaulted on the obligation to repay. We find that this is within the category of risk exclusion (e) meant to eliminate from coverage under the Bond.

Humboldt advances two primary arguments to convince the Court that this money does not fall within exclusion (e). First, Humboldt argues that a review of its internal accounting and financial reporting procedures demonstrates that Humboldt did not view or ever treat this transaction as a loan. *See* Humboldt's Opp. at 8, 13. Humboldt asserts that it never reported the revenue from the ATM Program as loan income, but rather, listed it in the general ledger as a cash entry. Further, Humboldt claims that its treatment of the ATM Program as a non-loan investment is consistent with standard practices in the banking industry, and that, "A determination that these programs constitute a loan would be completely contrary to the manner in which they are viewed, handled and reported to regulators by the banking industry." *Id.* at 13.

While this argument is somewhat compelling, we do not think it of such force to override the plain meaning of exclusion (e). Exclusion (e) is written broadly to include much more than just a "loan" as defined by banking industry standards. It also includes everything "*in the nature of* a loan" or an "extension of credit." Ex. C to Barkley Decl. (emphasis added). Moreover, "whether a particular transaction falls within [exclusion (e)] is determined by its economic substance, not by the labels attached to it by the insured and third party *dehors* the insuring agreement." *Resolution Trust Corp. v. Aetna Casualty and Surety Co.*, 25 F.3d 570, 578 (7th Cir.1994). For the reasons discussed above, we find that the economic substance of this transaction has enough characteristics of a loan or an extension of credit to make exclusion (e) applicable. Exclusion (e) is written clearly and broadly to shift the risk to the insured for losses resulting from the default of any loan or transaction that functions as a loan. We cannot and will not rewrite the terms of the Bond to conform to the expectations of the banking industry.

Second, Humboldt argues that this transaction cannot be considered a loan because Humboldt always maintained, pursuant to the CSA, exclusive ownership and control of the subject funds. While it is true that the CSA grants Humboldt title and control over the money, this element does not preclude the Court from finding that this transaction was "in the nature of a loan." There is no authority for the proposition that a bank must relinquish possession or control over funds before exclusion (e) can apply. This is merely one of several factors considered by the Court, and in the end we determine that the overriding substance of this transaction is such that exclusion (e) is applicable. Moreover, Humboldt's argument here is belied by the fact that regardless of what the CSA states, it allowed Schwartz a significant amount of physical control and possession over the money. For all of these reasons, we find this argument unpersuasive.

### B. Was Schwartz or Schwaz Armored LLC an Employee of Humboldt?

█ In an effort to reinstate coverage, Humboldt tries to invoke an exception to exclusion (e) by arguing that Schwaz Armored was an "employee" of Humboldt.[2] Complaint, ¶ 26. Essentially, Humboldt claims that Schwaz Armored acted as an "electronic data processor . . . of accounting records" because it was required to prepare and send to Humboldt an Inventory Summary each time it replenished the ATMs with cash. To prepare the Invento-

ry Summary, Schwaz Armored would review the tapes inside the ATMs and report how much money had been taken out and/or replenished. See Ex. B to Ambrosini Decl. This form was then faxed to Humboldt. Humboldt claims that this function makes Schwaz Armored an employee of the bank under the "electronic data processor" definition. The Court disagrees, finding that it would be illogical to read this provision so broadly.

In addressing Humboldt's claim the Court again starts with the plain language of the Policy as understood by a reasonable layperson. The subsection of the definition of employee that Humboldt attempts to invoke here is as follows:

(g) any natural person and any organization authorized by the Insured to perform services for the Insured as electronic data processor of checks or negotiable orders of withdrawal or other accounting records of the Insured (hereinafter called "Processor") while performing such services. . . . A Federal Reserve Bank or clearing house, and customers of the Insured, shall not be deemed to be Processors.

Complaint, Ex. C. After reviewing this provision, we find Humboldt's interpretation implausible. Schwaz Armored simply was not engaged in the "processing" of electronic data. As explained above, Schwaz Armored merely recorded the balances for particular ATMs on a standard form and faxed that form to Humboldt. This was at best a subsidiary function for

---

2. It is somewhat unclear which entity Humboldt is alleging to be an "employee" under the Policy. In its Complaint, Humboldt alleges that Schwartz and Direct Connect gathered information for Tehama. Complaint, ¶ 26. However, in its opposition brief Humboldt asserts that Schwaz Armored acted as an employee because it was charged with preparing the Inventory Summary form. Humboldt's Opp. at 16. This confusion is likely the result

of the fact that Schwartz has always been the sole principal of both Direct Connect and Schwaz Armored, and therefore it was undoubtedly Schwartz who recorded and transmitted this information (although it is not clear in which capacity he was acting). In responding to this argument the Court will address Humboldt's most recent pronouncement, that which alleges Schwaz Armored to be an employee.

Schwaz Armored, whose primary responsibility was to safely transport currency. The Court cannot find that this reporting duty is tantamount to "data processing", as that term is used in this section. If the Court were to adopt Humboldt's position then every person who supplied the bank with accounting information would qualify as an employee under the Policy. It is readily apparent that the Policy is not so broad. Properly understood in the context of this section and the Policy as a whole, the Court finds that preparation of an Inventory Summary form does not convert Schwaz Armored into an "electronic data processor of ... accounting records...."

### C. Claim for Breach of Implied Covenant of Good Faith and Fair Dealing

We now turn to Gulf's motion for summary judgment on Humboldt's claim for breach of the implied covenant of good faith and fair dealing. Gulf argues that its interpretation of the Policy and its handling of Humboldt's claim was reasonable as a matter of law and therefore it is entitled to summary judgment on this claim.

"While the reasonableness of an insurer's claims handling conduct is ordinarily a question of fact, it becomes a question of law where the evidence is undisputed and but one inference can be drawn from the evidence." *Carlton v. St. Paul Mercury Ins. Co.*, 30 Cal.App.4th 1450, 1456, 36 Cal.Rptr.2d 229 (1994). "The key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable. Under California law, a bad faith claim can be dismissed on summary judgment if the defendant can show that there was a genuine dispute as to coverage...." *Guebara v. Allstate Insurance Company*, 237 F.3d 987, 992 (9th Cir.2001). As stated by the court in *Hubka v. Paul Revere Life Insurance Company:*

The genuine issue rule ... allows a district court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law.... On the other hand, an insurer is not entitled to summary judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.

215 F.Supp.2d 1089, 1092 (S.D.Cal.2002).

In the instant case we find it is indisputable that Gulf's denial of coverage was reasonable. The Court finds that Gulf's interpretation of the Policy and its handling of Humboldt's claim was reasonable as a matter of law and, accordingly, summary judgment will be granted in favor of Gulf on this claim.

## IV. CONCLUSION

Based on the foregoing discussion, Humboldt's motion for summary adjudication is HEREBY DENIED and Gulf's motion for summary judgment is HEREBY GRANTED.

**IT IS SO ORDERED.**